STATE OF NORTH CAROLINA v. GARFIELD NOAH PREVETTE

No. 62A85

(Filed 2 July 1986)

1. **Constitutional Law § 34; Criminal Law § 26.5— murder and kidnapping—reliance on same restraint—double jeopardy**

In order to avoid a violation of the constitutional prohibition against double jeopardy in a case in which defendant was convicted of first degree murder and first degree kidnapping, defendant's conviction of kidnapping must be vacated where the State relied on the same evidence of restraint which was an inherent feature of the victim's murder by suffocation to support the restraint element of kidnapping, and where the trial court's kidnapping instructions related to restraint of the victim for the purpose of terrorizing the victim "by preventing her from removing a mouth gag to get sufficient passage of air."

2. **Homicide § 21.5— first-degree murder—premeditation and deliberation—sufficient evidence**

The State presented sufficient evidence of premeditation and deliberation to support defendant's conviction of first degree murder by suffocation where it tended to show that there was no provocation by the victim; while still in prison before the murder, defendant told a fellow inmate that he was going to kill the victim because he had seen her talking to a black prisoner at a religious meeting; shortly before his release from prison, defendant told a fellow inmate that he had unfinished business in the area and that if he returned to prison, he would have either a life sentence or no release date; defendant described the murder to a witness as a brutal one before the circumstances were made known to him by the police; defendant moved out of his apartment the day after the murder; the victim was beaten about her face, her hands were tied behind her back, and her knees were also bound; the binding at the knees was so securely tied that it bruised the skin directly underneath; the bindings prevented the victim from removing a gag wrapped tightly around her mouth and head; defendant left the elderly and obese victim in this position, obviously realizing that she was helpless and would not be missed or discovered for many hours; death resulted within one to three minutes or as long as thirty minutes after the gag was placed across the victim's mouth, and she endured physical and psychological torture before she died of suffocation; and defendant was present while the victim was dying.

3. **Homicide § 15— statement by defendant—relevancy to show intent to kill**

Testimony in a murder case concerning defendant's statement that he had "unfinished business" in the area to take care of upon his release from prison had some probative value on the issue of defendant's intent to kill the victim and was thus relevant and properly admitted. N.C.G.S. § 8C-1, Rule 401.

4. **Criminal Law § 122.1— additional instructions on first degree murder—failure to reinstruct on second degree murder**

In view of the jury's specific request for a clarification of the elements of first degree murder only, the trial court did not abuse its discretion in refus-

ing to reinstruct on second degree murder pursuant to defendant's request when it reinstructed on first degree murder.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments entered by *Pope, J.*, at the 4 September 1984 Criminal Session of Superior Court for WAYNE County. Defendant's motion to bypass the Court of Appeals on the Class D felony was allowed on 2 December 1985.

Defendant was charged with first degree murder, first degree sexual offense, first degree kidnapping, common law robbery, larceny, receiving stolen property, and possessing stolen property. The charges of first degree sexual offense and receiving stolen property were voluntarily dismissed prior to trial. At the conclusion of the State's presentation of evidence, the trial court dismissed all the remaining charges against defendant, except for murder and kidnapping. The jury returned a verdict of guilty of first degree murder on the basis of malice, premeditation and deliberation and under the felony murder rule. The jury also returned a verdict of guilty of first degree kidnapping. On the jury's recommendation, defendant was given a life sentence for murder. For kidnapping, defendant was sentenced to a forty year consecutive term of imprisonment.

The State's evidence tended to show that on Sunday morning, 8 January 1984, sometime after 8:00 a.m., Goldsboro Police Sergeant V. E. Davis, Jr., responded to a call from the station concerning Ms. Goldie Jones. He arrived at her home on South Oleander Avenue around 8:51 a.m. and noticed that her car, a 1977 Datsun, was gone. A police dispatcher had phoned Ms. Jones' residence and found the line to be busy. Sergeant Davis knocked on the front and back doors but received no answer. He further determined that the doors were locked and all windows were secured. After talking with some neighbors, Davis radioed officers to be on the lookout for Ms. Jones and her car. Davis then went to the home of the Granthams who lived directly behind Goldie Jones and asked Mrs. Grantham to call Ms. Jones' brother and sister-in-law, Harry and Mary Jones, to ascertain Ms. Jones' whereabouts and to get permission to enter Ms. Jones' home. Sergeant Davis thereafter resumed his patrol duties and later returned to the Grantham home around 11:00 a.m. However, Mrs. Grantham had not yet been able to contact the Joneses.

At approximately 3:00 p.m. that same day, Sergeant Davis met Harry Jones at Ms. Goldie Jones' residence. Mr. Jones gave Davis permission to enter his sister's house. Sergeant Davis removed a storm window on the back porch where the wooden window was unlocked. Davis entered the house through the window into the den. According to Davis, the den appeared ransacked with the room's contents scattered all over the floor. As he proceeded through the house, Davis entered the kitchen and noticed that the telephone receiver was off the hook. He then walked through the living room which was "very neatly kept" to the bedroom in the front of the house. Davis there observed Ms. Jones, an elderly female, lying on the bed on her back left side. She was nude and her ankles, knees, wrists, and mouth were bound by various materials. Her face was swollen and bruised. Davis further noticed smeared fecal matter underneath the body on the bed. He then radioed other police officers and a rescue unit. Davis testified that, besides the rescue personnel's check for the victim's vital signs, nothing in the house was disturbed.

SBI crime lab analyst Dennis Honeycutt arrived at Goldie Jones' residence that day at approximately 5:51 p.m. After a preliminary walk-through examination, Agent Honeycutt began his crime scene search at 6:00 p.m. He measured the size and recorded the contents of each room in the house. Of particular interest, he noted that there was a bathtub half-filled with water; a pink curtain tie-back missing from the second bedroom and a pink cloth tied around the victim's hands; a blood-stained eyeglass lens on a bookcase in the front bedroom with the victim; a kitchen towel partially covering the fecal matter near the victim's buttocks; a blood-like stain on the bedroom door frame; two orange plastic scissor handles without the attached blades on the den floor; a pair of glasses frames missing one lens on the den floor; several items of clothing including a pair of brown pants, a brown shirt, a toboggan, a girdle, and a bra on the den floor; and the contents of a tan pocketbook dumped on the bed in the second bedroom. Honeycutt also vacuumed the house for hair evidence, tested various stains with phenolphthalein solution for indications of blood, examined the body with cyanocrylate fuming for fingerprints and collected fingerprints from other locations in the house. He received positive results of blood on a couch cushion on

the den floor, on the couch itself, on the den floor, and in the hallway.

The following day at approximately 10:30 a.m., Dr. Robert M. Anthony, an expert in the field of forensic pathology, performed an autopsy on the body of Goldie Jones. Dr. Anthony testified that the victim was 5'5" in height, 191 pounds, and sixty-one years of age. He first noted that Ms. Jones' hands were bound behind her back with some type of pink "drapery hangings," that her ankles were tied together by nylon stockings, that her knees were bound by a bathrobe belt, and that her mouth was bound and gagged through the use of an apron.

As Dr. Anthony removed these bindings, he observed an abundance of fecal material across the small of the victim's back, buttocks, and the back of both legs. Dr. Anthony stated that the spread of this material across the body indicated that the victim was most likely alive when she defecated and was probably having thrashing agonal movements. He noticed that the back of the victim's right knee was bruised directly underneath the affixed ligature. Dr. Anthony likewise observed that the victim's left eye was bruised. He discovered a large amount of blood and mucus in her nose. He stated that the injury to the nose could have resulted from the same blow to the eye. Dr. Anthony further observed that the apron gag was quite wet and damp in the area adjacent to Ms. Jones' mouth by a mixture of blood, saliva and vomitus. He explained that if the victim had been suffering from an upper respiratory infection she would have been breathing primarily through her mouth. He therefore placed significance on the presence of mucus in the victim's nose and vomitus in the back of the victim's mouth. In Dr. Anthony's opinion, the vomitus would have soaked the gag further, making the normally porous apron cloth a more effective airtight seal, or would have acted as an irritant and blocked the victim's ability to move air. He concluded from his examination that Ms. Jones "died as a result of suffocation from having a gag tied across her mouth."

Dr. Anthony also explained the stages the body goes through when approaching death by suffocation:

As the oxygen levels get lower a person would ordinarily go through an initial phase of excitement and struggle against whatever it was that was causing their lack of oxy-

gen. If it was a binding it would be fighting against that. If its water or [a] pillow, whatever it happens to be they're going to fight against that. As they lose strength and begin to lose consciousness a series of events will happen. People will begin to have problems with irregular heart beats. They may lose control of their bowels and bladder, and once that occurs . . . irreversible injury to the brain has occurred. Death usually occurs shortly thereafter.

He concluded that at the time Ms. Jones lost control of her bowels she would have been in a depressed state of consciousness, approaching death. Dr. Anthony opined that death resulted within one to thirty minutes after the gag had been placed across Ms. Jones' mouth. Dr. Anthony estimated that prior to the autopsy the victim had been dead eighteen to thirty-six hours, placing the time of death between 10:30 p.m., Saturday, 7 January 1984, to 4:30 p.m., Sunday, 8 January 1984.

Finally, Dr. Anthony's examination revealed small superficial lacerations present along the walls of the vagina. In his opinion, these lacerations might have been caused by a male penis or by a pair of scissors.

Also, on 9 January 1984, Agent Honeycutt went to the Ash Street Service Center to check Ms. Jones' car for evidence. The car had been spotted by Ms. Lillie Rudisill around 4:00 a.m. on 8 January 1984 parked on a street next to her house, one-half mile from defendant's residence. After the Sunday evening news, she called the police who had the car towed to the Service Center. Agent Honeycutt found the driver's door unlocked and the turn signal in the left turn position. With the help of Officers Melvin and Pinto, Honeycutt lifted latent fingerprints from the interior driver side door, the steering wheel, and the inside of the gas tank cover. No ignition key was discovered.

Next, evidence was obtained from a trash dumpster located near defendant's residence at the time of the slaying. On 10 and 11 January 1984, police searched the dumpster and found a brown paper bag and a clear plastic bag containing: (1) a brown wallet; (2) a pair of scissor blades with a stain on it; (3) seven keys on a ring; (4) a black pair of scissors; and (5) a pair of blue jeans. The scissor blades discovered in the trash fit the orange scissor handles found by the officers on Goldie Jones' den floor. The keys

found among the trash fit Ms. Jones' 1977 Datsun, the back door of her residence, and various other locks found at the victim's residence. Furthermore, the brown wallet contained several personal papers and credit cards in Ms. Jones' name.

An analysis of all the physical evidence collected was performed by various SBI experts. SBI forensic chemist Scott Worsham, an expert in the field of hair analysis and comparison, found that pubic hairs obtained from the victim's bedroom floor and brown blouse were microscopically consistent with known pubic hairs of defendant and could have originated from him. SBI forensic serologist Jona Medlin determined that blood found on the victim's couch and cushion was consistent with the victim's blood. According to SBI fingerprint expert Joyce Petzka, fingerprints lifted from the plastic bag found in the trash dumpster were identical to defendant's right middle finger and right ring finger. Also, Agent Petzka testified that a fingerprint obtained from the door frame between the victim's kitchen and den matched defendant's left index finger and a fingerprint found on the steering wheel of the car matched defendant's right ring finger.

Other evidence produced by the State revealed that prior to January 1984, Ms. Jones had met defendant while he was in prison through the Yoke Fellows, a religious organization which conducted Bible study and held devotionals with the inmates at the prison.

Mrs. Frances Creech, age 71, testified that on Saturday, 7 January 1984, Goldie Jones arrived at her house at approximately 11:00 a.m. They went to list their taxes and to do other shopping. Ms. Jones, who was not feeling well due to a virus, drove Mrs. Creech back to her house around 2:00 p.m. Next, Mrs. Helen Gulick, age 83, testified that later that afternoon Goldie Jones drove her to the grocery store around 4:30 p.m. When they returned to Mrs. Gulick's home around 5:30 p.m., they decided that Ms. Jones, even with her cold, would pick Mrs. Gulick up at 8:00 a.m. the next day to go to mass as they had done on a number of prior occasions. Between 7:00 p.m. to 7:30 p.m. and 7:50 p.m. that evening, Mrs. Verna Mullinax talked with Goldie Jones on the telephone. She testified that during their conversation Ms. Jones stated that "she ha[d] a visitor and that it was Garfield and that [Mrs.

Mullinax] knew him." Mrs. Mullinax informed the victim that one of the girls associated with Yoke Fellows had gotten married. Then she heard Ms. Jones ask: "Garfield, did you know that little girl at Yoke Fellows had got [sic] married?" She heard a male voice respond. Later, around 9:00 p.m., Ms. Jones called Mrs. Gulick to obtain Minnie Tarzy's unpublished telephone number.

Shortly after 9:00 p.m., Mrs. Tarzy received a telephone call from Ms. Jones who asked if a friend presently in her home could wait in the Waynesborough House lobby until his roommate who had taken his apartment keys returned. Mrs. Tarzy replied that the lobby had just closed at 9:00 p.m. She suggested that she call Father Harper at the church rectory and asked Ms. Jones to call back to let her know what happened. Mrs. Tarzy testified that she waited until 12:30 a.m., but that the victim did not call.

Reverend Jimmy Whitfield testified that after 9:00 p.m. on Saturday evening defendant phoned him at his home trying to locate his roommate, Robert Sweet, because he had been locked out of their apartment. Reverend Whitfield replied that he did not know where Sweet was and heard some conversation on defendant's end, but could not identify the sex of the person's voice.

Finally, Mrs. Gulick testified that when Ms. Jones failed to pick her up for mass the next morning she called her number and found the line busy. At 8:20 a.m., she called the police and asked them to check by Ms. Jones' house.

The State also offered the testimony of Daley Potter, a cellmate of defendant's who had attended Yoke Fellows meetings with him. Potter testified that defendant normally sat with Ms. Jones during these meetings. According to Potter, around Christmas of 1982, defendant stated in reference to Ms. Jones: "I'm going to kill the nigger loving bitch because she was talking to a black guy at Yoke Fellows." In early 1983, defendant told Potter that he had tried to touch Ms. Jones' private area during a Yoke Fellows meeting, but that she had pushed his hand away. In October of 1983, on the night before defendant's release, he told Potter that he had some unfinished business to take care of in the area and that if he ever returned to prison he would return for life or with no release date.

Robert Sweet testified that defendant had started living with him in November of 1983. Sweet stated that on Saturday, 7 January 1984, defendant was not at home when he returned around 2:30 p.m. Sweet was awakened later that night between 11:00 and 11:30 p.m. by defendant who was preparing to go to bed. On the following Monday, Sweet discovered when he returned from work that defendant had moved out.

Goldsboro Police Sergeant Perry Sharp testified that on Sunday evening, 8 January 1984, he located defendant at Sweet's apartment. When informed about Ms. Jones' death, defendant told Sharp that his last contact with the victim was by phone the previous day. Defendant indicated that they had conversed twice, around 4:30 to 5:00 p.m. and 7:30 to 8:00 p.m. During Sharp's interview with defendant, Sharp did not describe the manner in which Ms. Jones had died.

Later that Sunday evening, defendant called Ina Mixen and stated that "Goldie has been brutally murdered" and that he had just been visited by the police. At trial, Mrs. Mixen read a letter written by defendant to her admitting that he was at the victim's house until 8:00 p.m. on Saturday, 7 January, but denying that he had killed her.

Defendant offered no evidence.

*Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant-appellant.*

BRANCH, Chief Justice.

[1] Defendant first assigns as error the trial court's denial of his motion to dismiss the kidnapping charge against him. He contends that the State failed to produce substantial evidence of the kidnapping element of restraint which was separate and distinct from the restraint evidence necessary to sustain his murder conviction. Because the jury found defendant guilty of first degree murder on theories of premeditation and deliberation and felony murder, there was no merger of the kidnapping conviction with the murder conviction, and additional punishment could be im-

posed for kidnapping. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

> When a defendant is tried in a single trial for violations of two statutes that punish the same conduct the amount of punishment allowable under the double jeopardy clause of the Federal Constitution and the law of the land clause of our State Constitution is determined by the intent of the legislature.

*State v. Freeland*, 316 N.C. 13, 21, 340 S.E. 2d 35, 39 (1986).

On a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, giving it the benefit of every reasonable intendment and inference to be drawn therefrom. *State v. Brown*, 315 N.C. 40, 58, 337 S.E. 2d 808, 822 (1985).

In order to sustain a conviction for kidnapping, the State must prove that "the defendant unlawfully confined, restrained, or removed the person for one of the eight purposes set out in the statute." *State v. Moore*, 315 N.C. 738, 743, 340 S.E. 2d 401, 404 (1986). The trial court in the case *sub judice* submitted the offense of kidnapping to the jury on the theory that defendant had confined and restrained Goldie Jones for the purpose of terrorizing her. *See* N.C.G.S. § 14-39(a)(3) (Cum. Supp. 1985). The trial court in its instructions correctly defined terrorizing as "more than just putting another in fear. It means putting that person in some high degree of fear, a state of intense fright or apprehension." *See State v. Moore*, 315 N.C. at 745, 340 S.E. 2d at 405. The trial judge further instructed as follows:

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about January 7 and 8, 1984 Garfield Noah Prevette unlawfully confined Goldie Gray Jones in a bedroom and restrained her, that is, by binding or tying up her hands, knees and feet, and Goldie Gray Jones did not consent to this confinement and restraint, and that this was for the purpose of terrorizing Goldie Gray Jones by preventing her from removing a mouth gag to get a sufficient passage of air into her body, and that Goldie Gray Jones was not released in a safe place and had been seriously injured, it

would be your duty to return a verdict of guilty of first degree kidnapping.

The trial court's charge on first degree murder based on premeditation and deliberation provided that the State, among other things, must prove that "defendant intentionally and with malice placed a gag across the mouth of Goldie Gray Jones, thereby causing her suffocation" and that "the placing of a gag across the mouth of Goldie Gray Jones . . . was a proximate cause of [her] death." Proximate cause was defined by the trial judge as "a cause without which Goldie Gray Jones' death would not have occurred."

In light of the evidence produced by the State and by virtue of these instructions, we are constrained to find that the restraint essential to the kidnapping conviction was an inherent and inevitable feature of this particular murder. We recognize the fact that murder is not within that class of felonies, such as forcible rape and armed robbery, which cannot be committed without some restraint of the victim. *State v. Fulcher*, 294 N.C. 503, 523, 243 S.E. 2d 338, 351 (1978). However, we agree with defendant's assertion that in this case the placement of the gag over Ms. Jones' mouth could not have been the proximate cause of her death without the binding of her hands and feet which prevented the removal of the gag. Based on the State's evidence, the victim's death would not have occurred without these other ligatures. Therefore, the restraint of the victim which resulted in her murder is indistinguishable from the restraint used by the State to support the kidnapping charge.

Contrary to the State's argument, the circumstances of this case did not involve a situation where two criminal offenses stemmed from the same course of action. *See State v. Fulcher*, 294 N.C. at 523, 243 S.E. 2d at 351-52; *State v. Price*, 313 N.C. 297, 327 S.E. 2d 863 (1985). The State presented no evidence which would indicate that defendant restrained the victim by any other means than by the bindings. Nor was there evidence that defendant terrorized her prior to committing the acts constituting the murder. Although there was evidence that the victim was struck in the face less than an hour before her death, there was no evidence indicating whether the victim was struck before being bound. Even the State's evidence tending to show that the victim

may have been sexually assaulted does not support its theory that defendant bound the victim for the purpose of terrorizing her due to the fact that the victim was bound at the knees, creating a reasonable inference that any sexual assault occurred prior to the placement of the bindings.

In any event, the trial court's specific instruction that the victim was restrained for the purpose of terrorizing the victim "by preventing her from removing a mouth gag to get a sufficient passage of air" requires this Court to assume that the jury impermissibly relied on the same evidence of restraint which was an inherent feature of the victim's murder by suffocation to support the restraint element of kidnapping. *State v. Fulcher*, 294 N.C. at 523, 243 S.E. 2d at 351; *see generally, State v. Freeland*, 316 N.C. 13, 340 S.E. 2d 35.

Because the State has failed to furnish any evidence of restraint apart from that necessary to accomplish the murder, defendant may not be separately punished for the kidnapping unless the legislature authorized cumulative punishment. *State v. Freeland*, 316 N.C. 13, 21, 340 S.E. 2d 35, 39; *State v. Gardner*, 315 N.C. 444, 460-61, 340 S.E. 2d 701, 712 (1986). Nowhere in the pertinent statutes did the legislature explicitly authorize cumulative punishment. Therefore, we must determine the legislature's intent by examining the subject, language, and history of the statutes. *State v. Gardner*, 315 N.C. at 461, 340 S.E. 2d at 712. Such an examination of the pertinent statutes yields no evidence that the legislature intended to authorize punishment for kidnapping when the restraint necessary to accomplish the kidnapping was an inherent part of the first degree murder.

Because the State failed to produce substantial evidence of restraint, independent and apart from the murder, we hold that the trial court improperly failed to allow defendant's motion to dismiss the charge of first degree kidnapping. In order to avoid a violation of the constitutional prohibition against double jeopardy, defendant's conviction for kidnapping must be vacated.

[2] By his second assignment of error, defendant contends that the trial court improperly denied his motion to dismiss the charge of first degree murder because the evidence was insufficient to prove the elements of premeditation and deliberation. Possible verdicts of involuntary manslaughter, second degree murder, first

degree felony murder, and first degree premeditated and deliberated murder were submitted to the jury. In general, before submitting the issue of a defendant's guilt to the jury, the trial court must be satisfied that the State has produced substantial evidence tending to prove each essential element of the offenses charged and that the defendant was the perpetrator. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980). On a motion to dismiss, the evidence must be taken in the light most favorable to the State, and the State must be given the benefit of every reasonable inference deducible therefrom. *State v. Hardy*, 299 N.C. 445, 263 S.E. 2d 711 (1980).

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808. Premeditation means that the act was thought out beforehand for some length of time, however short. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). Deliberation denotes an intent to kill carried out in a cool state of blood in furtherance of a fixed design. *State v. Poole*, 298 N.C. 254, 258 S.E. 2d 339 (1979).

The trial judge in instant case correctly instructed the jury as follows:

> Neither premeditation nor deliberation are usually susceptible of direct proof. They may be proven by a proof of circumstances from which they may be inferred such as the lack of provocation by the victim; conduct of the defendant before, during and after the killing; threats and declarations of the defendant; use of grossly excessive force; brutal or vicious circumstances of the killing; and the manner in which or the means by which the killing was done.

*See State v. Brown*, 315 N.C. at 59, 337 S.E. 2d at 822-23. Defendant argues that the evidence does not support the conclusion that defendant knew that the loose fabric of the apron would become blocked or that Ms. Jones could not breathe through her nose. According to defendant, the evidence is therefore insufficient to prove a premeditated and deliberated intent to kill. Defendant contends that at most the evidence may be sufficient to establish

malice or criminal recklessness to support the submission of second degree murder or involuntary manslaughter to the jury. He also suggests that there is no evidence of brutal or vicious circumstances.

We disagree and hold that the first degree murder elements of premeditation and deliberation are substantially supported by the State's evidence and the reasonable inferences arising thereon. In the first place, there was absolutely no evidence of provocation by the victim. Ms. Jones met defendant by her involvement with a religious organization concerned with the plight of prison inmates. Ms. Jones' willingness to help defendant even extended beyond his prison stay. The State's evidence tended to show that immediately prior to her murder Ms. Jones allowed defendant to enter her home as she attempted to find him a place to wait for his roommate who defendant alleged had taken his apartment key.

Secondly, defendant's conduct and declarations before and after the killing tend to show his premeditated and deliberated intent to kill. State's witness Daley Potter testified that while in prison defendant stated that he was going "to kill the nigger loving bitch" because he had seen Ms. Jones talking to a black prisoner at a Yoke Fellows meeting. Shortly before his prison release, defendant told Potter that he had unfinished business in the area and that if he returned to prison, he "would come back with it all," meaning either a life sentence or with no release date. Moreover, Ina Mixen testified that around 6:30 p.m. on Sunday, 9 January 1984, defendant telephoned her and stated that he had just been visited by the police and learned that Ms. Jones had been brutally murdered even though Sergeant Sharp stated that he had not described for defendant the circumstances surrounding the victim's death. Sergeant Sharp also testified that upon his request defendant gave him the telephone number of Robert Sweet's apartment in case the police needed to contact him further. Robert Sweet testified that when he returned from work the following day defendant had moved out.

Finally, the manner and means by which the killing was carried out, including the force used and its brutal circumstances, constitute substantial evidence sufficient to support a conclusion that the killing was premeditated and deliberated. The State's

evidence tended to show that the victim was beaten about her face. Her hands were tied behind her back and her knees and ankles were also bound. The ligature at the knees was so securely tied that it bruised the skin directly underneath. Furthermore, these bindings securing her limbs prevented the victim from removing a gag which was tightly wrapped around her mouth and head. Defendant left the victim, an elderly and obese woman, in this position, obviously realizing that she was helpless and would not be missed or discovered for many hours.

Dr. Anthony testified that once the gag was placed across Ms. Jones' mouth, death resulted within one to three minutes or as long as thirty minutes. He described the physical, and surely psychological, torture that the victim would endure as she died of suffocation. Dr. Anthony explained that the entire focus of the person would be to get her breath. As she became more and more hypoxic, she would fight and struggle to catch her breath, involving not only the usual muscles of respiration but all the accessory muscles, such as the muscles of the chest and abdomen. Dr. Anthony stated that the victim would begin to thrash around vigorously and would reach a state of terror as she fought with all her strength to get air. Contrary to defendant's argument, this method of murder was extremely cruel, increasing in its brutality the longer the victim lived and was forced to suffer. Defendant, himself, described the murder as a brutal one to Ina Mixen before the circumstances were made known to him by police.

There is also evidence, tending to establish the elements of premeditation and deliberation, that defendant was present while the victim was dying. SBI Agent Dennis Honeycutt testified that a kitchen towel or hand towel was partially covering the fecal material near the victim's buttocks. Honeycutt specifically stated that fecal material was found on the bottomside of the towel, not on the top of the towel, and very close to the victim's body. The other fecal material had been smeared by the victim's body as she thrashed from side to side. Dr. Anthony testified that by the time the victim lost control of her bowels she would be very close to death. Police Sergeant Davis, who discovered the body, testified that nothing in the house was disturbed and that the rescue personnel touched only Ms. Jones' neck for vital signs.

The State's evidence, taken together and in its most favorable light, was sufficient to survive defendant's motion to dismiss. We hold that the trial court properly denied defendant's motion to dismiss the charge of first degree murder based on premeditation and deliberation.

[3] Defendant next assigns as error the trial court's denial of his motion *in limine* to preclude Daley Potter's testimony concerning defendant's statement that he had "unfinished business" in the area to take care of upon his release from prison. He argues that because this testimony was never connected with the death of Ms. Jones it was irrelevant and that its admission constituted prejudicial error.

N.C.G.S. § 8C-1, Rule 401, defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This Court has stated on numerous occasions that evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case. *E.g., State v. Hannah*, 312 N.C. 286, 294, 322 S.E. 2d 148, 154 (1984); *State v. Bates*, 309 N.C. 528, 308 S.E. 2d 258 (1983).

The State argues that this portion of Potter's testimony, when taken with the rest of his testimony, is probative on the issues of defendant's motive and intent to kill Goldie Jones. Potter testified that on two different occasions defendant expressed anger and frustration towards the victim. The first incident occurred when Ms. Jones was seen talking to a black inmate. According to Potter's testimony, defendant who was extremely upset over the incident stated, "I'm going to kill the nigger loving bitch because she was talking to a black guy at Yoke Fellows." The second incident involved defendant's attempt "to stick his hand up around [Ms. Jones'] private area." He was prevented from doing so by the victim who refused such contact. The "unfinished business" statement was made after these incidents and in response to Potter's comment that defendant upon release should return to Colorado. Potter reminded defendant that taking care of such business would only bring him back to prison. Defendant acknowledged this fact and stated that he knew that if he did return "he would come back with it all."

Through Potter's other testimony, we find that the State has provided a logical basis on which this objected to statement may be connected with the crime committed. *Quoting* 1 Stansbury's North Carolina Evidence § 78, at 237 (Brandis rev. ed. 1973), this Court in *State v. Covington*, 290 N.C. 313, 335, 226 S.E. 2d 629, 645 (1976), stated:

> The standard of admissibility based on relevancy and materiality is of necessity so elastic, and the variety of possible fact situations so nearly infinite, that an exact rule cannot be formulated. In attempting to express the standard more precisely, the Court has emphasized the necessity of a *reasonable*, or *open and visible* connection, rather than one which is remote, latent, or conjectural, between the evidence presented and the fact to be proved by it, at the same time pointing out that the inference to be drawn need not be a *necessary* one. . . .

(Emphasis in original.)

Although the inference the State wished the jury to draw between the "unfinished business" statement and defendant's death threat against Ms. Jones was not necessarily the inference the jury would draw from this evidence, it was a reasonable one with a visible link to the crime charged against defendant. Because the "unfinished business" statement had some probative value on the issue of defendant's intent to kill the victim, we hold that the evidence was relevant and properly admitted.

[4] By his final assignment of error, defendant asserts that the trial court committed prejudicial error by failing to reinstruct the jury on the law of second degree murder when it, in response to the jury's request for a clarification on malice, premeditation, and deliberation, reinstructed the jury on first degree murder. Defendant reasons that the reinstruction on second degree murder was required in order to avoid the placement of undue emphasis on the charge of first degree murder. This contention lacks merit.

N.C.G.S. § 15A-1234 provides that "[a]t any time the judge gives additional instructions, he may also give or repeat other instructions to avoid giving undue prominence to the additional instructions." In *State v. Hockett*, 309 N.C. 794, 800, 309 S.E. 2d 249, 252 (1983), this Court concluded that the statute did not re-

quire that the trial judge repeat instructions previously given in the absence of some error in the charge. In fact, in *State v. Dawson*, 278 N.C. 351, 365, 180 S.E. 2d 140, 149 (1971), we held that "needless repetition is undesirable and has been held erroneous on occasion." In view of the jury's specific request for a clarification of elements of first degree murder only, we hold that the trial court did not abuse its discretion in refusing to reinstruct on second degree murder pursuant to defendant's request. We believe it important to note that the trial court is in the best position to determine whether further additional instruction will aid or confuse the jury in its deliberations, or if further instruction will prevent or cause in itself an undue emphasis being placed on a particular portion of the court's instructions.

For reasons stated, we hold that defendant's kidnapping conviction must be vacated, but that in all other respects defendant received a fair trial free from prejudicial error.

First Degree Kidnapping — vacated.

First Degree Murder — no error.