An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-490

Filed 2 July 2025

Franklin County, No. 20CRS050072-340

STATE OF NORTH CAROLINA

v.

FARREN SHUNTA YARBOROUGH

Appeal by defendant from judgment entered 19 July 2023 by Judge Keith Gregory in Franklin County Superior Court. Heard in the Court of Appeals 10 April 2025.

> *Attorney General Jeff Jackson's Office, by Assistant Attorney General Cannon E. Lane, for the State.*
>
> *Patterson Harkavy LLP, by Paul E. Smith, for the defendant-appellant.*

DILLON, Chief Judge.

Defendant Farren Yarborough appeals from a judgment entered upon a jury's verdict finding Defendant guilty of resisting, delaying, or obstructing a public officer. On appeal, Defendant challenges the trial court's denial of her motion to dismiss and failure to instruct on her right to resist unlawful detentions. She also argues she was deprived of her right to a unanimous jury verdict.

## I. Background

Only the arresting officer and Defendant testified at trial. Though their testimonies about the events on the morning of the arrest largely overlapped, their accounts differed with regard to the details of their interaction with each other.

The officer testified to the following: Around 5:45 am of 12 January 2020, he responded to the scene of a hit-and-run. Upon arrival, he approached the abandoned vehicle that caused the property damage. To identify the vehicle's driver, the officer ran the license plate. However, the search results of the plate did not match the vehicle. He could find no other information which might serve to identify the perpetrator of the hit-and-run except for what was listed in a warrant he found left inside the car, a warrant which listed Defendant's name and address. The officer did not notice the warrant also listed the name and address of Defendant's ex-husband until Defendant pointed out this fact later during his questioning of her.

Continuing his investigation, the officer went to Defendant's home, a trailer with bullet holes in its side. After he knocked, Defendant came to the door and "was willing to talk" with him. She exited her house and walked towards his vehicle where he started questioning her.

The officer described their conversation as follows: He first asked Defendant if she knew "what was going on" with the vehicle, or "any type of information" that he could get from her, and she said she didn't know the vehicle or its driver. Then it

changed to, "Well, it doesn't have anything to do with [me]," to which he replied,

"Well, then why is your warrant in here?" Defendant finally admitted her ex-husband

had the vehicle and that's why the warrant was in there. Trooper Lamancusa

testified,

> So she started to get more agitated as we were talking and more irate. She started to say some cuss words and stuff. And at that point I was just like, well, I was trying to defuse the situation. I said, "Well, just hang out for me. Let me do some work on this." I was going to try to identify her ex-husband . . . But when I was asking for that information she didn't want to tell me. I said, "Okay . . . hang tight . . . give me a couple seconds."
>
> As I was looking up stuff on my computer she started to walk back towards the door [of her trailer] . . . . At that point I kind of took one leg and kind of stood up out the side of the [car]. And I was just like, "Hey, please stay right here. Don't go inside." She said, "No," she wanted to go inside. She didn't want to talk to me anymore. I said, "That's fine." I said, "You don't need to talk but you need to stay here."
>
> So I - - at that point in the investigation I didn't know who was driving or what was going on. She was still an active suspect. So she continued to start to walk towards the door. And the only thing in my mind was, "Why is she trying to get back inside the house." Being that the bullet holes, stuff like that, I was scared that she was trying to get some type of weapon against me.
>
> \* \* \*
>
> I told her probably . . . more than ten times to stay at the vehicle . . . . She started to get more afraid and I walked over to her and I . . . put myself between her and the door and said, "No. Look you need to come back this way." She tried to go around me. I grabbed her at that point. And I said, "No, we need to go back this way," as I was trying to

escort her back to the vehicle.

And she started to pull away and started to get very loud. I noticed someone else come out of the trailer so I kind of pushed back on her at that point and was focusing on what was coming out of the trailer. And it was . . . the defendant's daughter . . . approximately 15 or 16 years old . . . . [Both of them] started screaming and yelling and saying, "Stop" . . . .

* * *

So she kept pulling away to the point where I didn't want to . . . take any type of harmful action on her. . . . At that point she was just actively trying to pull away. So I was trying to pull back against her to get her to come towards my vehicle.

* * *

She kept pulling away, and at some point we ended up on the ground . . . . I think I got one handcuff on and [ ] - - before I could get the other one on, she pulled the other arm out.

Eventually, the officer was able to handcuff Defendant and place her in his vehicle. She was arrested for resisting, delaying, or obstructing an officer.

Defendant testified to a different version of events: Early in the morning, she was wakened by "a bang at the door" and someone yelling "Come on out." Because there had been a shooting at the house before, from which she had gotten shot and seriously injured in her left arm, and because her daughter was in the house, Defendant, startled, jumped up and came to the door wearing nothing but a nightgown and "a plastic bag" on her head. She testified that she went outside because of what the officer had yelled. Transcript of her testimony reads:

[The officer] wasn't asking me questions.  He was accusing me of stuff . . . .  So I explained to him that I had been home all night . . . .  [H]e was asking me about the vehicle.  And I said, "My vehicle is right here.  I've been here all night." . . .  So I explained [ ] to him . . . I didn't have a clue as to what vehicle he was talking about, what incident, because like I said, I had been home all night.  So I knew nothing of what he was talking about.

So at some point he showed me a warrant and I said, "Yeah, that's me.  That's a domestic violence warrant for myself and my [ex-]husband . . . .  We had been divorced since 2017.  And we're not allowed to be around each other . . . .  And so at this point we established it was not me driving the vehicle.  And I walked him back to his vehicle to leave.  This was my understanding he was leaving.  He got in his vehicle sat down, and I was standing at the door.  And then he said, "Well, sometimes husbands and wives get back together."  I said, "Well, that's not the case here."  And then I said, "Have a nice day."

As I said that, he jumped out the vehicle, grabbed my arm, [and] took like I wasn't going nowhere.  And then I'm looking at him like he's crazy because, for one, my [left] arm is in shambles.  I can't even move my hand.  And he started trying to put me in handcuffs and pulled my arm, which was broken and really damaged at that time, behind my back like a maniac.  So I'm pulling on him - - I'm pulling my arm because he hasn't told me I was under arrest.

* * *

And no point did he let me know that I was under arrest, that I was detained, or that - - that anything.

* * *

Not once did he say, "I need you to stay right here."

As to the struggle, Defendant testified that her arm was already seriously injured at the time and she was afraid for her life, and,

I wouldn't let him put my other arm in the handcuff.  By

- 5 -

the time he got back to my step, and I was crying and everything. And he had one handcuff on my arm. And he said, "I'm about to slam you." And then he picked me up in the air and tried to throw me on the ground. And somehow I just rolled my body . . . . And then while he was laying on the ground, I slid handcuffs off my hand.

Defendant also testified that when he was questioning her, "He wasn't looking up anything," and "I said, all the information to my ex-husband is on that same warrant where you got my name from . . . . And it also had his address, his date of birth, his Social Security number . . . . "

The jury convicted Defendant of resisting, delaying, or obstructing a public officer ("RDO").

## II. Analysis

Defendant makes four arguments on appeal, which we will address in turn.

### A. Motion to Dismiss

Defendant argues the trial court erred in denying her motion to dismiss for insufficiency of the evidence.

We review these motions *de novo*. *State v. Barnett*, 368 N.C. 710, 713 (2016). To survive a motion to dismiss, there must be substantial evidence of each essential element of the crime and that the defendant is the perpetrator. *State v. Winkler*, 368 N.C. 572, 574 (2015). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79 (1980). When reviewing the evidence to determine whether it is sufficient to survive

a motion to dismiss, it must be considered in the light most favorable to the State; and the State is entitled to every reasonable inference from the evidence. *Winkler*, 368 N.C. at 574.

Section 14-223(a) of our General Statutes provides, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge an official duty, the person is guilty of a Class 2 misdemeanor." The elements of RDO are: (1) the victim was a public officer; (2) the defendant knew or had reasonable grounds to believe the victim was a public officer; (3) the victim was discharging or attempting to discharge a duty of his office; (4) the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and, (5) the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse. *State v. Washington*, 193 N.C. App. 670, 679 (2008).

In dispute of the third, fourth, and fifth elements, Defendant argues that the officer did not have *the right* to detain Defendant and that *she* therefore had the right to ignore his commands to remain at his patrol car.

However, an officer may conduct a warrantless, investigatory stop upon reasonable and articulable suspicion of criminal activity. *State v. Hughes*, 353 N.C. 200, 206–07 (2000). An analysis of whether an investigatory stop is lawful or unlawful is determined by an examination of the information known by the officer attempting the stop, not known by the individual being subjected to the stop.

*Washington*, 193 N.C. App. at 682. "The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch." *State v. Watkins*, 337 N.C. 437, 441 (1994) (cleaned up). A person does not have the right to flee from an investigatory stop. *Washington*, 193 N.C. App. at 682. And during an investigatory stop, law enforcement officers are permitted to use "measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically used during an arrest." *State v. Campbell*, 188 N.C. App. 701, 709 (2008); *see, e.g.*, *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006). An officer may use handcuffs to protect his personal safety or to maintain the status quo of the stop. *Campbell*, 188 N.C. App. at 709.

Here, there is evidence the officer found a warrant listing Defendant's (and her ex-husband's) name and address inside a vehicle that caused a hit-and-run, and that the officer went to Defendant's address with intent to investigate the crime. After Defendant came outside, he continued his investigation by questioning her in an attempt to identify or eliminate her as the perpetrator of the crime. Defendant confirmed that it was her and her ex-husband's names on the warrant and admitted that her ex-husband had possessed the vehicle. The officer testified that he considered Defendant an active suspect when she refused further questioning and started walking back towards her house. Some evidence suggests he told her to stop several times and she would not comply and that, having noticed bullet holes in her trailer upon his arrival, he was worried she might be going to get a weapon.

Viewing all inferences in the light most favorable to the State, we conclude substantial evidence existed from which a jury could determine the officer had reasonable suspicion sufficient to conduct an investigatory stop and that he used an appropriate measure of force to protect his personal safety and maintain the status quo during the stop.

B.  No Instructions on the Right to Resist Lawful Detentions

Defendant contends the trial court erred in failing to instruct the jury that Defendant was permitted to use reasonable force to resist an unlawful detention.

If the evidence tends to show an unlawful arrest occurred, it is error for the trial court to fail to instruct the jury on the right to resist an unlawful arrest.  *State v. Burwell*, 256 N.C. App. 722, 731 (2017) (citing *State v. Sparrow*, 276 N.C. 499, 513 (1970)) (holding a trial court was in error when its instructions ignored whether the officers' actions were lawful when the evidence for the defendants tended to show the officers' actions were unlawful).

Because Defendant did not object to the alleged error at trial, we review for plain error.  *State v. Lawrence*, 365 N.C. 506, 518 (2012).  To establish plain error, the defendant must show a fundamental error occurred at trial which had a probable impact on the outcome of trial, meaning that, absent the error, the jury probably would have returned a different verdict.  *State v. Reber*, 386 N.C. 153, 158 (2024).  Moreover, the defendant must how that the error is an exceptional case that warrants

plain error review, typically by showing that the error seriously affects the fairness,

integrity or public reputation of judicial proceedings. *Id.*

Here, the trial court instructed the jury for the charge of resisting a public

officer as follows:

> [T]o find the defendant guilty of this offense the State must
> prove five things beyond a reasonable doubt:
>
> First, that the victim was a public officer . . . .
>
> Second, that the defendant knew or had reasonable
> grounds to believe that the victim was a public officer.
>
> *Third, that the victim was discharging [or] attempting to
> discharge a duty of his office.* The defendant was walking
> away from Trooper Lamancusa towards a home and would
> not stop pulling away while Trooper Lamancusa was trying
> to detain the defendant. *At the time, Trooper Lamancusa
> was discharging [or] attempting to discharge a duty of his
> office* by investigating a vehicle collision involved in a hit
> and run.
>
> Fourth, that the defendant resisted, delayed, or obstructed
> the victim in discharging or attempting to discharge a duty
> of his office.
>
> *And fifth, that the defendant acted willfully and
> unlawfully, that is intentionally and without justification
> or excuse.*

(Emphasis added).

Defendant insists the unlawfulness of the detention was a central issue of the

case and that failing to instruct the jury on the question of lawfulness prevented the

jury from doing the core of its job. In support of this contention, Defendant cites *State*

*v. Sparrow* from our Supreme Court, a case involving charges of RDO and a factual

controversy. 276 N.C. 499 (1970). In that case, the officers testified they had obtained permission to enter the defendants' home, but evidence for the defendants tended to show that the officers entered without knocking or obtaining permission. *Id.* at 504. The central question was "whether the officers entered . . . legally[,]" *id.* at 513, but the trial court did not submit it to the jury; "[t]here were no instructions bearing upon the rights of the [defendants as to whether] the entry by the officers was illegal." *Id.*

However, unlike in *State v. Sparrow*, this case does not turn on a factual controversy. The uncontroverted evidence shows that Trooper Lamancusa came to Defendant's house to carry out an investigation, that Defendant willfully left her home to talk with him, that her name was on the warrant, and that she attempted flight. Rather, the central question of this case is whether Trooper Lamancusa had reasonable suspicion to conduct an investigatory stop of Defendant, which is an issue we have already discussed.

Presuming an error occurred in the instruction to the jury, we conclude Defendant has not shown that, absent the error, the jury *probably* would have returned a different verdict.

C. Response to Jury's Request for Instructions on Lawful Arrest

Third, Defendant contends the trial court abused its discretion in electing not to offer the jury additional instructions after it asked these questions: (1) "When does a person have the right to resist an arrest legally?"; (2) "What constitutes a lawful versus unlawful arrest?"; and (3) "Does [sic] Miranda Rights have to read [sic] and

were they?" In response, the trial court said, "as far as each question is concerned, you're required to follow the law as given. You're also required to remember the facts you heard in the case." We review for abuse of discretion. *State v. Prevette*, 317 N.C. 148, 164 (1986).

Notably, as the State points out, these questions concerned arrest, and Defendant was charged with resisting *detention*. We agree with the State that the trial court acted within its discretion to decline to give additional instructions that may have caused confusion to the jury in its deliberations. *See id.*

### D. Defendant's Right to a Unanimous Verdict

Finally, Defendant contends the trial court erred by violating her right to a unanimous verdict. Error of this kind is automatically preserved for appeal. *State v. Wilson*, 363 N.C. 478, 484 (2009); *see also* N.C.G.S. § 15A-1237. The State bears the burden of proving that the error was harmless beyond a reasonable doubt. *Wilson*, 363 N.C. at 487.

"[J]urors must unanimously agree that the State has proven beyond a reasonable doubt each and every essential element of the crime charged." *State v. Jordan*, 305 N.C. 274, 279 (1982). A jury instruction can be "fatally ambiguous, thereby resulting in an uncertain verdict in violation of defendant's right to a unanimous verdict." *State v. Lyons*, 330 N.C. 298, 311 (1991). An instruction that "allows the jury to find a defendant guilty if he commits either of two underlying acts, *either of which is in itself a separate offense,* is fatally ambiguous because it is

impossible to determine whether the jury unanimously found that the defendant committed one particular offense." *Id.* at 298 (emphasis in original).

Defendant argues the trial court's instructions contained ambiguities which permitted the jury to convict even if some jurors felt she was resisting a lawful detention, and therefore committed no offense at all.

We do not find this argument to be persuasive. Here, the trial court used Pattern Jury Instruction 230.30, which instructs on all five elements of resisting, delaying, or obstructing a public officer. It is our opinion the pattern jury instruction provided the jury with the law it needed in order to convict Defendant of the offense charged. We conclude the trial court did not reversibly err.

### III.  Conclusion

We conclude Defendant received a fair trial, free from reversible error.

NO ERROR.

Judge TYSON and GORE concur.

Report per Rule 30(e).