STATE OF NORTH CAROLINA v. CASSANDRA BOSTON AND
CARRYNE SATTERWHITE

No. COA07-1364

(Filed 5 August 2008)

**1. Jury— deliberations—instruction—*Allen* charge—plain error analysis**

The trial court did not commit plain error in a first-degree arson case by instructing the jury on the *Allen* charge under N.C.G.S. § 15A-1235(c) regarding jury deliberations because: (1) N.C.G.S. § 15A-1235(c) does not require an affirmative indication from the jury that it is having difficulty reaching a verdict, nor does it require that the jury deliberate for a lengthy period of time before the trial court may give the *Allen* instruction; (2) N.C.G.S. § 15A-1235(c) provides that the trial court may give the *Allen* instruction if it appears to the judge that the jury is unable to reach a verdict; and (3) the trial court did not deprive defendant of a fair trial by concluding that after each one-to-two hour period of deliberation, the jury was having difficulty reaching a verdict and an *Allen* charge would be appropriate.

**2. Jury— deliberations—instruction—multiple *Allen* charges— inquiry into numerical division—totality of circumstances review**

A review of the totality of circumstances revealed that the trial court did not coerce a verdict in a first-degree arson case by its multiple *Allen* charges and inquiries into the jury's numerical division because: (1) the trial court never inquired as to whether the majority of the jury was in favor of guilt or innocence, and in fact, the trial court specifically asked the jury foreman not to provide this information to the trial court; the record gave no indication that the trial court ever appeared frustrated with the jury or annoyed by the jury's failure to reach a verdict; the trial court

never threatened to hold the jury until it reached a verdict; and it made no mention of the burden and expense of a retrial in the event the jury could not reach a verdict; (2) the record suggested that the trial court was simply trying to monitor the jury's progress so that it could plan recesses accordingly, and in fact, each of the trial court's inquiries and *Allen* charges either immediately preceded or followed a natural break in jury deliberations such as the lunch recess or evening recess; and (3) the trial court never interrupted jury deliberations merely to inquire as to the jury's numerical division or to repeat the *Allen* charge.

**3. Judges— expression of opinion—repeated inquiries and *Allen* charges**

The trial court did not impermissibly express an opinion as to the weight of the evidence in an arson case by its repeated *Allen* charges and inquiries into the jury's numerical division because: (1) the trial court gave facially neutral instructions in accordance with the language provided in N.C.G.S. § 15A-1235(b); and (2) the transcript did not indicate the trial court ever editorialized regarding the weight of the evidence during deliberations, nor was there any indication by the trial court that the jury's progress was inadequate given the evidence before it.

**4. Constitutional Law— privilege against self-incrimination—pre-arrest silence—substantive evidence—harmless error**

The admission of testimony by an accomplice and a detective in an arson case that defendant refused to speak with the police prior to her arrest violated defendant's Fifth Amendment privilege against self-incrimination where defendant did not testify at trial and the testimony was admitted as substantive evidence. However, this improper use of defendant's pre-arrest silence was harmless error because: (1) the jury would have reached the same verdict even had the trial court disallowed the contested testimony based on the overwhelming evidence of defendant's guilt; (2) the transcript revealed that any testimony relating to defendant's pre-arrest silence was de minimis; (3) accomplice's testimony of defendant's pre-arrest silence was in the context of explaining the sequence of events; (4) the detective's testimony regarding defendant's pre-arrest silence was not elicited by the State, but instead was a fleeting statement made by the detective during a long narrative recitation of the witness's prior statements to him; and (5) when considered with the State's other

**STATE v. BOSTON**

[191 N.C. App. 637 (2008)]

substantial evidence of defendant's guilt, defendant's pre-arrest silence was simply not a significant or essential part of the State's case-in-chief.

**5. Arson— first-degree—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant Boston's motion to dismiss the charge of first-degree arson, even though defendant contends the State presented inconsistent theories of her guilt, because: (1) while the victim's testimony and an accomplice's testimony do contain some inconsistencies, they are consistent as they relate to the elements of first-degree arson; (2) the accomplice's testimony regarding the circumstances surrounding the fire was sufficient to demonstrate that defendant Boston acted willfully and maliciously in setting the fire; (3) both witnesses identified the building burned as a dwelling house of another person, namely, the victim; (4) the victim testified that she was home at the time of the fire, and the accomplice did not contradict this testimony; (5) the accomplice identified defendant Boston as one of the people who started the fire, and the victim did not contradict this testimony; and (6) while the State's evidence did contain some nonmaterial discrepancies, these discrepancies were for the jury to consider when reaching a verdict.

Appeal by Defendant Cassandra Boston from judgment entered 18 May 2007 by Judge J.B. Allen, Jr. in Superior Court, Wake County. Appeal by Defendant Carryne Satterwhite from judgment entered 18 May 2007 by Judge J.B. Allen, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 30 April 2008.

*Attorney General Roy Cooper, by Assistant Attorney General W. Wallace Finlator, Jr., for the State.*

*Attorney General Roy Cooper, by Assistant Attorney General John A. Payne, for the State.*

*D. Tucker Charns for Defendant Cassandra Boston.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Kristen L. Todd, for Defendant Carryne Satterwhite.*

McGEE, Judge.

A jury found Cassandra Boston (Defendant Boston) guilty on 18 May 2007 of first-degree arson. The trial court sentenced Defendant

Boston to a term of sixty-four months to eighty-six months in prison. A jury found Carryne Satterwhite (Defendant Satterwhite) guilty on 18 May 2007 of first-degree arson. The trial court sentenced Defendant Satterwhite to a term of sixty-four months to eighty-six months in prison. Defendants Boston and Satterwhite appeal.

Officer Michael Lindley (Officer Lindley) of the Cary Police Department testified that at 5:07 a.m. on 23 June 2006, he was dispatched to a structure fire at a house owned by Ivany Hockaday (Ms. Hockaday) in Cary, North Carolina. When Officer Lindley arrived at the house, he saw that the back porch of the house was on fire. Officer Lindley entered the house, found Ms. Hockaday inside with her three children, and helped them out of the house. Officer Lindley testified that Ms. Hockaday told him that around 4:45 a.m., she had heard someone banging on her front door. When Ms. Hockaday looked out her window, she observed a gray vehicle parked in front of her house. Ms. Hockaday saw a male in the driver's seat and three female passengers.

Ms. Hockaday testified at trial that Defendant Boston and Defendant Satterwhite (together, Defendants) were sisters. According to Ms. Hockaday, her family and Defendants' family had been feuding for approximately one year. The feud originally began as a conflict between Ms. Hockaday's young daughter and Defendants' younger sister, but eventually grew to involve various older family members. Ms. Hockaday testified that members of Defendants' family periodically slashed her car tires and threw eggs at her car. Ms. Hockaday also described a physical altercation between herself and Defendant Satterwhite that occurred a week before the fire. The altercation escalated to include dozens of people, and police were called to control the situation.

Ms. Hockaday testified that sometime between 4:00 a.m. and 4:30 a.m. on the morning of the fire, she was awakened by noises coming from the back of her house. According to Ms. Hockaday, she heard multiple female voices laughing, and also heard a thumping sound. Ms. Hockaday telephoned her husband, who told her to call the police. Ms. Hockaday then heard a loud knock at her front door. She looked out her front window and saw a light grey car parked outside. The car was driven by a male with three female passengers. Ms. Hockaday testified that she recognized the three females as Defendant Boston, Defendant Satterwhite, and another female named Faith Streeter (Ms. Streeter).

Ms. Hockaday testified that after speaking with her husband, she then called the police. The police informed Ms. Hockaday that they had already received a telephone call reporting that her house was on fire. Ms. Hockaday had not previously realized that her house was on fire. She then opened the back door to her house and discovered that her back porch was on fire. Ms. Hockaday unsuccessfully attempted to put out the fire, and police arrived at her house a short time later. The fire destroyed portions of Ms. Hockaday's back porch, roof, and siding. Ms. Hockaday later told police that she was "[one] hundred percent sure" that Defendants and Ms. Streeter were responsible for starting the fire.

Ms. Streeter testified at trial that she and Defendants had been friends for three or four months prior to the fire. Ms. Streeter also testified regarding the ongoing feud between Defendants' family and Ms. Hockaday's family in the months prior to the fire.

Regarding the alleged arson, Ms. Streeter testified that in the early morning hours of 23 June 2006, she was with a friend in an apartment complex near Defendants' apartment. Ms. Streeter's friend's vehicle was out of gasoline, so Ms. Streeter walked to a nearby gas station and filled a milk carton with gasoline. Ms. Streeter then walked back to her friend's apartment, but her friend was not home. Ms. Streeter then walked to Defendants' apartment and told them that she had purchased some gasoline. According to Ms. Streeter, Defendant Satterwhite suggested that they go to Ms. Hockaday's house. Defendants and Ms. Streeter then walked a short distance to Ms. Hockaday's house. Ms. Streeter and Defendant Satterwhite poured gas on Ms. Hockaday's back porch stairs. Defendant Boston then lit a piece of paper with a lighter and threw it on the porch stairs, igniting a fire. The three women watched the fire for approximately fifteen seconds, and then ran from the scene. Ms. Streeter testified that the three women were not laughing and were trying not to make any noise. Ms. Streeter also denied having been in a vehicle near Ms. Hockaday's house at any time immediately before or after the fire. Ms. Streeter later confessed her involvement to police and wrote a statement that generally corroborated her trial testimony.

Wake County Deputy Fire Marshal Charles Ottoway (Marshal Ottoway) testified at trial that he examined Ms. Hockaday's house following the fire. Marshal Ottoway testified that he believed that a flammable liquid had been poured on Ms. Hockaday's back porch before the fire started. Marshal Ottoway also testified that he smelled

a faint odor of gasoline coming from the burned portion of Ms. Hockaday's back porch.

Defendants' cases were joined for trial. A jury found Defendant Boston guilty on 18 May 2007 of one count of first-degree arson. The jury also found Defendant Satterwhite guilty on 18 May 2007 of one count of first-degree arson. Defendants appeal.

I.

Defendant Satterwhite raises three arguments on appeal, each concerning certain jury instructions given by the trial court after the jury began its deliberations.

The jury in this case began its deliberations around 11:12 a.m. on 17 May 2007. At 1:00 p.m., just before the lunch recess, the trial court asked the jury foreman if there was a numerical split among the jurors as to guilt or innocence. The jury foreman informed the trial court that the jury was split eleven-to-one.[1] At 2:30 p.m., following the lunch recess and before the jury resumed deliberations, the trial court instructed the jury as follows:

> Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Each juror must decide the case for himself or herself, but only after an impartial consideration of the evidence with his or her fellow jurors.

> In the course of deliberation, a juror should not hesitate . . . to reexamine his or her own views and change his or her opinion if convinced it is erroneous, and no juror should surrender his or her honest conviction as to the weight or the effect of the evidence solely because of the opinion of his or her fellow jurors or for the mere purpose of returning a verdict.

See N.C. Gen. Stat. § 15A-1235(b)-(c) (2007). The trial court again inquired as to the jurors' numerical split prior to an afternoon recess at 3:45 p.m. At 4:00 p.m., the trial court again gave the jury the *Allen* charge, and the jury resumed deliberations. The trial court excused the jury for the evening recess at 5:00 p.m.

Before the jury resumed its deliberations on 18 May 2007, the trial court gave the jury the *Allen* charge a third time. The jury resumed its deliberations at 10:55 a.m., and reached a verdict around 11:20 a.m.

---

1. The jury foreman did not, however, disclose whether the eleven votes were in favor of guilt or innocence.

STATE v. BOSTON

[191 N.C. App. 637 (2008)]

A.

[1] Defendant Satterwhite first argues that the trial court was not authorized to instruct the jury pursuant to N.C.G.S. § 15A-1235(c). Defendant Satterwhite did not object to the trial court's instructions at trial, and we therefore review the trial court's instructions for plain error. To find plain error, the error in a trial court's instructions to the jury must have been "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against [the defendant]." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

N.C.G.S. § 15A-1235(b) provides that a trial court may give the jury the *Allen* charge prior to jury deliberations. Further, under N.C.G.S. § 15A-1235(c), "[i]f it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the [*Allen*] instructions[.]" Defendant Satterwhite argues that the trial court had no authority to give the *Allen* charge because the jury had only been deliberating for a short time and had not indicated that it was having any difficulty reaching a verdict.

We disagree with Defendant Satterwhite's contentions. N.C.G.S. § 15A-1235(c) does not require an affirmative indication from the jury that it is having difficulty reaching a verdict, nor does it require that the jury deliberate for a lengthy period of time before the trial court may give the *Allen* instruction. Rather, N.C.G.S. § 15A-1235(c) provides that the trial court may give the *Allen* instruction "[i]f it appears to the judge" that the jury is unable to reach a verdict.

In this case, the jury had been deliberating for nearly two hours when the trial court first gave the *Allen* instruction. The jury then deliberated another seventy-five minutes before the trial court gave the second *Allen* instruction. The jury then deliberated another hour and took an evening recess before the trial court gave the third *Allen* instruction. Based on this record, it is possible that the trial court instructed the jury more frequently than was necessary to assist the jury in reaching a verdict. However, we do not believe that the trial court deprived Defendant Satterwhite of a fair trial by concluding that after each one-to-two hour period of deliberation, the jury was having difficulty reaching a verdict and an *Allen* charge would be appropriate under N.C.G.S. § 15A-1235(c). Defendant Satterwhite's assignment of error is overruled.

B.

**[2]** Defendant Satterwhite next argues that the trial court's multiple *Allen* charges and inquiries into the jury's numerical division impermissibly coerced a verdict. Defendant Satterwhite did not object to the trial court's instructions at trial, and we therefore review the trial court's instructions for plain error.

Our Supreme Court has held that "a charge which might reasonably be construed by a juror as requiring him to surrender his well-founded convictions or judgment to the views of the majority is erroneous." *State v. Alston*, 294 N.C. 577, 593, 243 S.E.2d 354, 364 (1978). To determine whether the trial court's instructions "forced a verdict or merely served as a catalyst for further deliberation," our Court "must consider the [totality of the] circumstances under which the instructions were made and the probable impact of the instructions on the jury." *Id.* at 593, 243 S.E.2d at 364-65. Our Courts also apply a totality-of-the-circumstances test when determining whether a trial court's inquiry into the jury's numerical division impermissibly coerced a verdict. *State v. Fowler*, 312 N.C. 304, 308, 322 S.E.2d 389, 392 (1984).

Factors relevant to these inquiries include: the length of time the jury had been deliberating, *State v. Beaver*, 322 N.C. 462, 465, 368 S.E.2d 607, 609 (1988); the number of times the trial court inquired into the jury's numerical division, *id.*; whether the trial court inquired as to whether the majority of the votes were in favor of guilt or innocence, *id.* at 464, 368 S.E.2d at 608; whether the trial court was respectful to the jury or conveyed to the jury that it was irritated at the jury's lack of progress, *id.*; whether the trial court threatened to hold the jury until it reached a verdict, *id.*; whether the jury reported to the trial court that it was deadlocked, *State v. Bussey*, 321 N.C. 92, 97, 361 S.E.2d 564, 567 (1987); whether the trial court mentioned the inconvenience or expense of a new trial in the event the jury became deadlocked, *Alston*, 294 N.C. at 593, 243 S.E.2d at 365; whether the trial court inquired into the jury's numerical division merely for purposes of scheduling recesses, *Fowler*, 312 N.C. at 309, 322 S.E.2d at 392; and whether the trial court was merely trying to determine whether the jury had made progress towards reaching a verdict. *Id.*

In this case, the trial court never inquired as to whether the majority of the jury was in favor of guilt or innocence. In fact, the trial court specifically asked the jury foreman not to provide this information to the trial court. The record gives no indication that the trial

court ever appeared frustrated with the jury or annoyed by the jury's failure to reach a verdict. Further, the trial court never threatened to hold the jury until it reached a verdict, and made no mention of the burden and expense of a retrial in the event the jury could not reach a verdict.

It is true that the jury never told the trial court that it was deadlocked. It is also true that the jury deliberated roughly four and one-half hours over a two-day span, and during this time, the trial court inquired as to the jury's numerical division two times and gave the *Allen* charge three times. However, the record suggests that the trial court was simply trying to monitor the jury's progress so that it could plan recesses accordingly. In fact, each of the trial court's inquiries and *Allen* charges either immediately preceded or followed a natural break in jury deliberations, such as the lunch recess or evening recess. The trial court never interrupted jury deliberations merely to inquire as to the jury's numerical division or to repeat the *Allen* charge. Based on the totality of these factors, we hold that the trial court did not coerce a verdict, and therefore did not deny Defendant Satterwhite a fair trial.

C.

[3] Finally, Defendant Satterwhite argues that the trial court impermissibly expressed an opinion as to the weight of the evidence by its repeated *Allen* charges and inquiries into the jury's numerical division. Specifically, Defendant Satterwhite contends that by its repeated interventions into the jury proceedings, the trial court "expressed that the evidence was clear and that a verdict should be easy to reach," and "implied that the jury was somehow inadequate for not realizing the simplicity of the case in front of it." Defendant Satterwhite did not object to the trial court's instructions at trial, and we therefore review the trial court's instructions for plain error.

"In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995). In the present case, the trial court gave facially neutral instructions in accordance with the language provided in N.C.G.S. § 15A-1235(b). The trial transcript does not indicate that the trial court ever editorialized regarding the weight of the evidence during jury deliberations. Likewise, the transcript does not reveal any implication on the trial court's part that the jury's progress was inadequate given the evidence before it. Given these factors, and given our findings discussed

in Part I.B. above, we hold that the trial court did not offer an impermissible opinion as to the weight of the evidence merely due to its repeated inquiries and *Allen* charges. The trial court therefore did not deny Defendant Satterwhite a fair trial. Defendant Satterwhite's assignments of error are overruled.

## II.

Defendant Boston raises two issues on appeal. We consider each of Defendant Boston's issues in turn.

## A.

**[4]** Defendant Boston first argues that the trial court erred by overruling her objection to certain portions of Ms. Streeter's testimony. Defendant Boston also argues that the trial court erred by permitting former Detective Thomas Doyle (Detective Doyle) of the Cary Police Department to testify regarding certain statements Ms. Streeter made to Detective Doyle.

During direct examination, Ms. Streeter testified that at 11:00 p.m. on 23 June 2006, she and Defendants met at a nearby Pizza Hut restaurant. Ms. Streeter then testified as follows:

[THE STATE]: And while you were there at the Pizza Hut, is that—is that when the police arrived?

[MS. STREETER]: Yes.

. . . .

[THE STATE]: Were you asked if you would be willing to go down and make a statement about what happened?

[MS. STREETER]: I was asked to go downtown. I was ask[ed] to go for questioning, yes.

[THE STATE]: Okay. And were [Defendant] Boston and [Defendant] Satterwhite also asked to go down for questioning?

[MS. STREETER]: Yes.

[THE STATE]: And what—

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Overruled.

. . . .

[THE STATE]: Did [Defendant] Boston agree to go downtown and answer the police's questions?

[MS. STREETER]: No.

. . . .

[THE STATE]: What did [Defendant] Boston tell the police?

[MS. STREETER]: That she had curfew.

[DEFENSE COUNSEL]: Objection, your Honor. May I be heard?

Defense counsel then argued outside of the jury's presence that it was improper for the State to elicit testimony regarding Defendant Boston's exercise of her right not to speak with police. The trial court again overruled Defendant Boston's objection and allowed Ms. Streeter to testify that Ms. Boston had refused to speak with police.

Later at trial, Detective Doyle testified that he had previously interviewed Ms. Streeter regarding the events of 23 June 2006. Detective Doyle indicated that during this interview, Ms. Streeter told him that when police confronted Defendant Boston at the Pizza Hut and asked her to come to the police station for questioning, Defendant Boston refused to speak with police.

Defendant Boston argues that introduction of this testimony violated her right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution, and under Article I, Section 23 of the North Carolina Constitution.

Defendant Boston relies on a number of cases for the proposition that the State's use of her silence was constitutional error. In *State v. Hoyle*, 325 N.C. 232, 382 S.E.2d 752 (1989), for example, the defendant was arrested for murder, advised of his *Miranda* rights, and declined to speak with police regarding the alleged murder. *Id.* at 234, 382 S.E.2d at 753. At trial, the defendant testified that the decedent had attacked him, that he had reached for his gun to defend himself, that the two men struggled for the gun, and that the gun accidentally discharged and hit the decedent. *Id.* The State then impeached the defendant by questioning him on cross-examination regarding his decision not to tell this story to police when police arrested him. *Id.* at 235-36, 382 S.E.2d at 753-54. Relying on *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91 (1976), our Supreme Court held that it was a violation of the defendant's Fourteenth Amendment due-process rights to use

STATE v. BOSTON

[191 N.C. App. 637 (2008)]

his post-arrest and post-*Miranda*-warning silence for impeachment purposes. *Id.* at 236-37, 382 S.E.2d at 754; *see Doyle*, 426 U.S. at 617-19, 49 L. Ed. 2d at 97-98 (holding that when a defendant has been arrested and advised of his *Miranda* rights, the State has implicitly promised not to use the defendant's silence against him and therefore cannot impeach the defendant on cross-examination by questioning him about his silence); *see also State v. Shores*, 155 N.C. App. 342, 573 S.E.2d 237 (2002), *disc. review denied*, 356 N.C. 690, 578 S.E.2d 592 (2003) (holding that the State's use of the defendant's post-arrest and post-*Miranda*-warning silence for impeachment purposes violated his right to remain silent).

The State correctly notes, however, that in both *Hoyle* and *Shores*, the defendants had already been arrested and advised of their *Miranda* rights at the time they exercised their right to remain silent. In contrast, in the current case, Defendant Boston had not been arrested when she refused to speak with police. Therefore, according to the State, it was not a violation of Defendant Boston's Fifth or Fourteenth Amendment rights for the State to elicit testimony regarding her refusal to speak with police. While we agree with the State that the cases cited by Defendant Boston are inapposite, we reject the State's contention that Defendant Boston's pre-arrest silence was not constitutionally protected.

Whether the State may use a defendant's silence at trial depends on the circumstances of the defendant's silence and the purpose for which the State intends to use such silence. For example, a defendant's decision to remain silent following her arrest cannot be used as substantive evidence of her guilt of the crime charged. *State v. Ward*, 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001). Similarly, a defendant's decision not to testify at trial cannot be used as substantive evidence of her guilt. *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, *reh'g denied*, 381 U.S. 957, 14 L. Ed. 2d 730 (1965). However, if the defendant is not yet under arrest, the State may use the defendant's pre-arrest silence for impeachment purposes at trial. *Jenkins v. Anderson*, 447 U.S. 231, 240, 65 L. Ed. 2d 86, 96 (1980); *see also, e.g., State v. Bishop*, 346 N.C. 365, 386, 488 S.E.2d 769, 780 (1997). If the defendant has been arrested but has not yet been informed of her *Miranda* rights, the State may use the defendant's silence for impeachment purposes. *Fletcher v. Weir*, 455 U.S. 603, 606-07, 71 L. Ed. 2d 490, 494 (1982) (per curiam). If the defendant has been arrested and has been informed of her *Miranda* rights, the State cannot use the defendant's silence for impeachment purposes. *Doyle*, 426

U.S. at 619, 49 L. Ed. 2d at 422; *see also Hoyle*, 325 N.C. at 236-37, 382 S.E.2d at 754.[2]

The situation presented by the current case, however, does not fit into any of the factual scenarios presented above. Here, the State used Defendant Boston's pre-arrest silence not to impeach her testimony, but rather as substantive evidence of her guilt.[3]

The United States Supreme Court has not previously determined whether the Fifth Amendment forbids the State's use of a defendant's pre-arrest silence for substantive, non-impeachment purposes. In *Jenkins*, the Court held that even if a defendant's pre-arrest silence is protected by the Fifth Amendment, impeachment by use of such silence does not violate the Fifth Amendment where the defendant testifies at trial. *Jenkins*, 447 U.S. at 238, 65 L. Ed. 2d at 94-95. However, the Court specifically declined to answer the question of whether a defendant's pre-arrest silence is constitutionally protected where the defendant continues to remain silent at trial:

> In this case, the [defendant] remained silent before arrest, but chose to testify at his trial. Our decision today does not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment. We simply do not reach that issue because [our prior case law] clearly permits impeachment even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent.

*Id.* at 236 n.2, 65 L. Ed. 2d at 93 n.2.

North Carolina Courts likewise have not determined whether the Fifth Amendment protects a defendant's pre-arrest silence. A majority of federal circuit courts considering this question have held that such protection does exist. In *U.S. ex rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987), for example, the state presented evidence that the defendant refused to speak with police when police attempted to question him regarding two murders committed the previous week. *Id.* at 1015. The prosecutor also commented on the de-

---

2. North Carolina courts have also held that even where the State's use of a defendant's silence to impeach the defendant's trial testimony is constitutionally permissible, the State, in order to use the defendant's silence in this manner, must also demonstrate that the defendant's prior silence amounted to a prior inconsistent statement. *See, e.g., Bishop*, 346 N.C. at 386-87, 488 S.E.2d at 780-81.

3. The State's purpose in eliciting the challenged testimony was clearly not to impeach Defendant Boston's credibility or alibi. Defendant Boston did not testify at trial and presented no other evidence on her behalf.

fendant's pre-arrest silence during closing argument. *Id.* The United States Court of Appeals for the Seventh Circuit first noted that because the defendant did not testify at trial, the state's purpose in referring to the defendant's silence was not to impeach him, but rather to raise a substantive inference of his guilt. *Id.* at 1017. The Court then held that such use of the defendant's silence violated his Fifth Amendment rights:

> [*Griffin*] held that neither the prosecutor nor the court may invite the jury to draw an inference of guilt from an accused's failure to take the stand. . . .
>
> While it is true that *Griffin* involved governmental use of the defendant's silence at trial, rather than when initially questioned by police, . . . we do not believe th[is] factor[] make[s] a difference. The right to remain silent, unlike the [Sixth Amendment] right to counsel, attaches before the institution of formal adversary proceedings. . . . [W]e believe *Griffin* . . . applies equally to a defendant's silence before trial, and indeed, even before arrest.

*Id.*

Three other federal circuit courts are in accord with the Seventh Circuit's holding in *Savory. See Girts v. Yanai*, 501 F.3d 743, 752 (6th Cir. 2007), *reh'g denied*, 2008 U.S. App. LEXIS 3661 (2008), *petition for cert. filed* (U.S. May 19, 2008) (No. 07-1452) (holding that the prosecutor's statements concerning the defendant's pre-arrest silence were "improper" and "constitute[d] prosecutorial misconduct because [the defendant's] silence cannot be used against him as substantive evidence"); *Combs v. Coyle*, 205 F.3d 269, 283, *reh'g denied*, 2000 U.S. App. LEXIS 6843 (6th Cir. 2000), *cert. denied, Bagley v. Combs*, 531 U.S. 1035, 148 L. Ed. 2d 533 (2000) (holding that "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination"); *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991), *cert. denied*, 503 U.S. 997, 118 L. Ed. 2d 411 (1992) (relying on *Griffin* to hold that "once a defendant invokes his right to remain silent," even if such invocation occurs pre-arrest, "it is impermissible for the prosecution to refer to any Fifth Amendment rights which [the] defendant exercised"); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir. 1989), *cert. denied*, 493 U.S. 969, 107 L. Ed. 2d 383 (1989) (holding that where the defendant refused to confess to police prior to his arrest and did not testify at trial, the defendant "relied on the protection

guaranteed by the [F]ifth [A]mendment" and the prosecutor could not use such silence as evidence of guilt).

Three federal circuit courts have reached contrary conclusions. *See United States v. Oplinger*, 150 F.3d 1061, 1067 (9th Cir. 1998) (holding that admission of evidence regarding the defendant's refusal to discuss allegations of criminal activity with a work supervisor prior to his arrest "did not offend [the defendant's] privilege against self-incrimination under the Fifth Amendment or his right to due process under the Fourteenth Amendment"); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996) (holding that the government may introduce evidence of, and comment on, a defendant's pre-arrest silence where such silence was not induced by government action); *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) (stating that "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings").

After careful consideration of this persuasive precedent, we agree with the view espoused by the United States Courts of Appeal for the First, Sixth, Seventh, and Tenth Circuits. Contrary to the State's assertion, it is clear that a defendant's Fifth Amendment right against self-incrimination, unlike a defendant's Fifth Amendment right to counsel, does not attach solely upon custodial interrogation. *See, e.g., Kastigar v. United States*, 406 U.S. 441, 444, 32 L. Ed. 2d 212, 217, *reh'g denied*, 408 U.S. 931, 33 L. Ed. 2d 345 (1972) (noting that the privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory"). Therefore, we hold that a proper invocation of the privilege against self-incrimination is protected from prosecutorial comment or substantive use, no matter whether such invocation occurs before or after a defendant's arrest.[4] *See Coppola*, 878 F.2d at 1565 (stating that it is a "basic principle" that "application of the [self-incrimination] privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime").

Likewise, we find the views of the Fifth, Ninth, and Eleventh Circuits unpersuasive for a number of reasons. In *Rivera*, the

---

4. While we hold that a defendant's pre-arrest silence is constitutionally protected, it remains clear that the State may use a defendant's pre-arrest silence for impeachment purposes if the defendant chooses to testify at trial. *See Jenkins*, 447 U.S. at 240-41, 65 L. Ed. 2d at 96. "After all, there is no constitutional right to commit perjury, which impeachment is designed to detect." *Savory*, 832 F.2d at 1017.

Eleventh Circuit cited *Jenkins* for its broad statement that "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings." *Rivera*, 944 F.2d at 1568. Reliance on *Jenkins* for this proposition is misplaced, as *Jenkins* merely permitted use of a defendant's pre-arrest silence for impeachment purposes and specifically declined to address the issue of substantive comment on a defendant's pre-arrest silence. Similarly, in *Zanabria*, the Fifth Circuit held that the Fifth Amendment did not protect the defendant's pre-arrest silence, but cited no authority to support its holding. *See Zanabria*, 74 F.3d at 593. Finally, we find the Ninth Circuit's decision in *Oplinger* distinguishable on its facts. In *Oplinger*, the defendant remained silent in response to accusations of criminal activity from his job supervisor, prior to any government involvement or investigation. *See Oplinger*, 150 F.3d at 1064. Therefore, according to the Ninth Circuit, the Fifth Amendment did not protect the defendant's silence because "the government made no effort to compel [the defendant] to speak[.]"[5] *Id.* at 1067.

The United States Supreme Court has directed that the Fifth Amendment privilege against self-incrimination "must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486, 95 L. Ed. 1118, 1124 (1951). We have found no case in which the Supreme Court has construed the Fifth Amendment privilege against self-incrimination to allow the government's use of a defendant's silence as substantive evidence of his guilt, and we decline to adopt such a construction in the present case. We therefore hold that the trial court erred by allowing introduction of Ms. Streeter's and Detective Doyle's testimony regarding Defendant Boston's refusal to speak with police prior to her arrest.

We must now determine whether the constitutional error in Defendant Boston's trial was harmless beyond a reasonable doubt. *See* N.C. Gen. Stat. § 15A-1443(b) (2007). We may consider a number of factors in making this determination, including: whether the State's other evidence of guilt was substantial; whether the State emphasized the fact of Defendant Boston's silence throughout the trial; whether the State attempted to capitalize on Defendant Boston's silence; whether the State commented on Defendant Boston's silence during closing argument; whether the reference to Defendant Boston's si-

---

5. Because we find *Oplinger* distinguishable, we neither adopt nor reject the Ninth Circuit's reasoning in that case.

lence was merely benign or *de minimis*; and whether the State solicited the testimony at issue. *See, e.g., State v. Elmore*, 337 N.C. 789, 792-93, 448 S.E.2d 501, 502-03 (1994); *State v. Alexander*, 337 N.C. 182, 196, 446 S.E.2d 83, 91 (1994).

Our review of the record leads us to conclude beyond a reasonable doubt that the jury would have reached the same verdict even had the trial court disallowed the contested testimony. To begin, the State's evidence of guilt apart from Defendant Boston's silence was overwhelming. The State established Defendant Boston's motive through detailed testimony from Ms. Hockaday and Ms. Streeter regarding a recent feud between Defendant Boston's family and Ms. Hockaday's family. Ms. Streeter, who admitted to helping Defendant Boston start the fire, gave a detailed and thorough account of Defendant Boston's involvement in the arson. Detective Doyle testified that Ms. Streeter's testimony was consistent with statements that she gave to Detective Doyle the day following the fire and the week of Defendant Boston's trial. Further, Marshal Ottoway testified that he believed the fire was started with a flammable liquid, which was consistent with Ms. Streeter's testimony concerning the fire.

In addition, the trial transcript reveals that any testimony relating to Defendant Boston's pre-arrest silence was *de minimis*. The State did elicit such testimony from Ms. Streeter, but did so in the context of asking Ms. Streeter to describe the complete sequence of events that took place at Pizza Hut on the evening of 23 June 2006. Detective Doyle's testimony regarding Defendant Boston's pre-arrest silence was not elicited by the State, but rather was a fleeting statement made by Detective Doyle during a long narrative recitation of Ms. Streeter's prior statements to him. The State did not make Defendant Boston's pre-arrest silence a recurring theme of its case at trial, and the State did not comment on such silence during closing argument. When considered with the State's other substantial evidence of Defendant Boston's guilt, it is clear that Defendant Boston's pre-arrest silence was simply not a significant or essential part of the State's case-in-chief. We therefore conclude that the trial court's error in admitting the challenged testimony was harmless beyond a reasonable doubt.

B.

[5] Finally, Defendant Boston argues that the trial court erred by denying her motion to dismiss the first-degree arson charge due to insufficiency of the State's evidence. According to Defendant

Boston, the State did not meet its burden because it presented inconsistent theories of her guilt. Specifically, Defendant Boston notes that Ms. Hockaday testified that shortly before the fire began, she heard noises and women laughing outside her home. Further, Ms. Hockaday testified that shortly after the fire began, she saw Defendant Boston in a vehicle outside of her house. In contrast, Ms. Streeter testified that she and Defendant Boston did not make any noise when starting the fire, and that she and Defendant Boston ran from Ms. Hockaday's house after they started the fire, rather than getting into a vehicle. Defendant Boston contends that the alleged arson could not have been committed pursuant to both of the State's theories of guilt, and therefore the State did not produce sufficient evidence of her guilt.

"On a defendant's motion for dismissal on the ground of insufficiency of the evidence, the trial court must determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990). Further, the elements of first-degree arson are: "(1) the willful and malicious burning (2) of the dwelling (i.e., inhabited) house of another; (3) which is occupied at the time of the burning." *State v. Scott*, 150 N.C. App. 442, 453, 564 S.E.2d 285, 293, *disc. review denied and cert. denied*, 356 N.C. 443, 573 S.E.2d 508 (2002).

While Ms. Hockaday's testimony and Ms. Streeter's testimony do contain some inconsistencies, they are consistent as they relate to the elements of first-degree arson. Ms. Streeter's testimony regarding the circumstances surrounding the fire was sufficient to demonstrate that Defendant Boston acted willfully and maliciously in setting the fire. Both Ms. Hockaday and Ms. Streeter identified the building burned as a dwelling house of another person, namely, Ms. Hockaday. Ms. Hockaday testified that she was home at the time of the fire, and Ms. Streeter did not contradict this testimony. Further, Ms. Streeter identified Defendant Boston as one of the people who started the fire, and Ms. Hockaday did not contradict this testimony. The factual issues raised by Defendant Boston, including whether or not Defendant Boston was laughing when she started the fire, and whether she ran or drove away from the crime scene, have no bearing on the elements of first-degree arson.

We therefore hold that the State presented consistent and sufficient evidence to support a conviction of first-degree arson. While the State's evidence did contain some non-material discrepancies, these discrepancies were for the jury to consider when reaching a verdict. Defendant Boston's assignment of error is overruled.

In Defendant Satterwhite's appeal we find no error.

In Defendant Boston's appeal we find no prejudicial error.

Judges ELMORE and JACKSON concur.