STATE OF NORTH CAROLINA v. KIRK ORLANDO SMITH and BENNIE NATHANIEL
THOMPSON, Defendants

No. COA07-812

(Filed 2 December 2008)

### 1. Kidnapping— release in safe place—acting in concert

The trial court did not err by denying defendants' motions to dismiss a charge of first-degree kidnapping where defendants argued that the victim was released in a safe place by others with whom they were acting in concert. The fact that the State proceeded upon a theory of acting in concert does not require the conclusion that defendants released the victim in a safe place simply because one of the other perpetrators arguably did so, and the jury could reasonably conclude on the evidence that the repeated threats to kill the victim prompted another perpetrator, acting alone, to take the victim and release him in a parking deck.

### 2. Kidnapping— jury request for clarification—specific issues—no re-instruction on second-degree kidnapping

The trial court did not abuse its discretion in a kidnapping prosecution in its response to a jury request for clarification by re-instructing on first-degree kidnapping but not second-degree kidnapping. The jury requested clarification on specific issues, to which the court responded.

### 3. Criminal Law— inquiry into jury division—two and a half hours of deliberation

The trial court did not coerce a verdict when it inquired into the jury's numerical split after only two and a half hours of deliberation. The inquiry came at a natural break in deliberations and was expressed in language more typical of curiosity than irritation, the judge did not ask which votes were for conviction or acquittal, and the judge did not say anything suggesting concern over the failure to reach a verdict at that point.

### 4. Criminal Law— *Allen* charge—two and a half hours of deliberation

The trial court did not abuse its discretion by giving an *Allen* instruction after only two and a half hours of deliberation where the court did not ask whether the split was in favor of guilt or acquittal, the instruction was given during a natural break in the proceedings, there was nothing to indicate that the judge was

**STATE v. SMITH**

[194 N.C. App. 120 (2008)]

frustrated or annoyed, and there were no remarks beyond the statutory instructions that might be viewed as coercive.

Appeal by defendants from judgments entered 6 October 2006 by Judge J.B. Allen, Jr. in Wake County Superior Court. Heard in the Court of Appeals 9 January 2008.

*Attorney General Roy Cooper, by Assistant Attorneys General Sarah Y. Meacham and John A. Payne, for the State.*

*Nora Henry Hargrove for defendant-appellant Smith.*

*Geoffrey W. Hosford for defendant-appellant Thompson.*

GEER, Judge.

Defendants Kirk Orlando Smith and Bennie Nathaniel Thompson appeal from their convictions for first degree kidnapping and conspiracy to commit first degree kidnapping. Defendants contend on appeal that the trial court should have dismissed the first degree kidnapping charges and submitted only second degree kidnapping to the jury because the State presented evidence that they were acting in concert with another perpetrator who released the victim in a safe place. We hold that the theory of acting in concert is a basis for imposing criminal liability that cannot be used in the manner urged by defendants. Since the State presented sufficient evidence to permit the jury to reasonably find that defendants did not release the victim in a safe place, the trial court properly denied the motions to dismiss the charge of first degree kidnapping.

## Facts

The State's evidence tended to show the following facts. On 18 December 2005, Vernon Russell Harris was at his uncle's home near Apex when he received a cell phone call from Brandon Ingram, who had been a friend since early childhood. Ingram told Harris that he wanted to meet so that he could pay Harris money he owed him from a previous drug deal. When Ingram arrived outside Harris' uncle's home, he called Harris again and asked him to come outside. Harris met Ingram at the back of Ingram's car. Harris could see three other people in the car, but could not identify them because it was dark outside. While pretending to count out the money owed Harris, Ingram pulled out a gun and pointed it at Harris. A man later identified as Smith, jumped out of the back passenger seat also holding a gun, grabbed Harris, and put him in the backseat of the car. Ingram got

into the car and drove away. Smith and another man, identified only as "Tim," sat on either side of Harris in the backseat of the car. The two men blindfolded Harris, forced him to keep his head between his legs, and repeatedly hit him in the face while Ingram drove the car around for approximately six hours.

Ingram ordered Harris to call Harris' cousin, Brandon Hinton, to ask for money and drugs in exchange for his release. On his cell phone, Harris was able to reach Hinton and told him: "[S]ome guys got me and they want $50,000 and a brick[,]" referring to a kilogram of cocaine. Hinton responded that he had no cocaine but that he would try to "round up some money." Because the men repeatedly threatened to kill Harris if their demands were not met, Harris kept calling Hinton, asking him to hurry. Harris also called his girlfriend and another close friend, asking them to call Hinton and tell him to hurry.

Late in the evening of 18 December 2005, Harris' father learned what had happened and took over negotiating with the men. Harris' father also called the police, who came to his house and assisted with the negotiations. According to Harris' father, during the negotiations, defendants Smith and Thompson "did the majority of the talking all the time." Defendants told Harris' father that they would kill Harris if he did not give them money, they burned Harris on the neck and arms with cigarettes so that his father would hear him scream. Because it was a Sunday night, Harris' father told defendants that he could not get the money until the bank opened the next morning. The men then drove Harris to an abandoned house in Durham, took him inside, and duct-taped him to a chair.

On the morning of 19 December 2005, defendants called Harris' father, who had gotten $27,000.00 from a bank, and directed him to drop off the money at a designated location. Defendants Smith and Thompson left the house to pick up the money, leaving Ingram and Tim to watch Harris. Defendants called once to ask what type of car Harris' father drove, but after this call, there were no further communications between defendants and Ingram and Tim.

After defendants left to retrieve the money, Tim told Ingram that they needed to kill Harris. As a "spur-of-the-moment thing," Ingram took Harris in Tim's car and dropped him off in the parking deck of Northgate Mall in Durham. On the way there, Ingram threatened Harris not to say anything about his involvement or he would kill

Harris. Fearing that the other men might find and kill him, Harris hid behind some construction equipment in the parking deck. Shortly after someone let him use their cell phone to call his father, a police patrol car drove through the parking deck broadcasting Harris' name. Although he eventually came out from his hiding place, he did not do so immediately because he was afraid that the men might be nearby looking for him.

After watching Harris' father drop off the money, defendants Smith and Thompson picked it up and drove away. The SBI attempted to apprehend Smith and Thompson, but lost them in traffic. Smith was later caught in Virginia òn 24 December 2005 after he sped through a license checkpoint. When arrested, the police found $6,000.00 in cash, which was traced back to the ransom money based on the serial numbers that the SBI had recorded prior to the delivery of the money. When the police arrested Thompson in Durham on 21 January 2006, they recovered no money.

Both Smith and Thompson were charged with first degree kidnapping and conspiracy to commit first degree kidnapping. The jury found them guilty of both charges. The trial court entered a prayer for judgment continued for each defendant on the conspiracy charge because defendants were sentenced under the first degree kidnapping charge. The court, based on each defendant's prior record level, then sentenced Smith to a presumptive-range term of 133 to 169 months imprisonment and Thompson to a presumptive-range term of 73 to 97 months imprisonment. Defendants timely appealed to this Court. They raise identical arguments on appeal.

I

[1] Defendants first argue that the trial court erred in denying their motions to dismiss the charges of first degree kidnapping. According to defendants, the trial court should have submitted to the jury only the charge of second degree kidnapping rather than the charges of both degrees of kidnapping. "Kidnapping is considered to be in the first-degree when the kidnapped person is not released in a safe place or is seriously injured or sexually assaulted during the commission of the kidnapping." *State v. Bell*, 359 N.C. 1, 25, 603 S.E.2d 93, 100 (2004) (citing N.C. Gen. Stat. § 14-39(b) (2003)), *cert. denied*, 544 U.S. 1052, 161 L. Ed. 2d 1094, 125 S. Ct. 2299 (2005). In contrast, "[i]f the person kidnapped was *released in a safe place by the defendant* and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree . . . ." N.C. Gen. Stat. § 14-39(b) (2007)

(emphasis added). Defendants contend that the evidence established that they released Harris in a safe place.

A defendant's motion to dismiss should be denied if there is substantial evidence: (1) of each essential element of the offense charged and (2) of defendant's being the perpetrator of the offense. *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002). Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion. *Id.* at 597, 573 S.E.2d at 869. On review of a denial of a motion to dismiss, the appellate court must view the evidence in the light most favorable to the State, giving it the benefit of all reasonable inferences. *Id.* at 596, 573 S.E.2d at 869.

Although defendants admit that they did not personally release Harris in a safe place, they argue that because they were acting in concert with Ingram, the fact that Ingram released Harris in a safe place establishes that they also released Harris in a safe place. Defendants cite no authority—and we have found none—supporting use of the doctrine of acting in concert in this manner.

The theory of "acting in concert" is a means of imputing to a defendant the acts of another perpetrator: " 'Under the doctrine of acting in concert, if two or more persons act together in pursuit of a common plan or purpose, each of them, if actually or constructively present, is guilty of any crime committed by any of the others in pursuit of the common plan.' " *State v. McCullers*, 341 N.C. 19, 29-30, 460 S.E.2d 163, 169 (1995) (quoting *State v. Abraham*, 338 N.C. 315, 328-29, 451 S.E.2d 131, 137 (1994)). "Acting in concert" is a theory of criminal liability, just like aiding and abetting. *See State v. Estes*, 186 N.C. App. 364, 372, 651 S.E.2d 598, 603 (2007) (describing acting in concert and aiding and abetting as "two theories of criminal liability"), *appeal dismissed and disc. review denied*, 362 N.C. 365, 661 S.E.2d 883 (2008); *State v. Roberts*, 176 N.C. App. 159, 163, 625 S.E.2d 846, 850 (2006) (describing the theories of acting in concert or aiding and abetting as theories of "vicarious liability"). Indeed, our Supreme Court has explained:

> The only distinction in criminal culpability between one who actually commits the crime and one of the other guilty parties to the offense . . . is the technical difference between being a principal in the first degree and being a principal in the second degree. A principal in the first degree is the person who actually perpetrates the deed and a principal in the second degree is one who is actually or constructively present when the crime is com-

mitted and aids and abets another in its commission. The law, however, recognizes no difference between a principal in the first degree and a principal in the second; both are equally guilty.

. . . The distinction between aiding and abetting and acting in concert . . . is of little significance. Both are equally guilty, and are equally punishable.

*State v. Williams,* 299 N.C. 652, 655-56, 263 S.E.2d 774, 777 (1980) (internal citations omitted).

Accordingly, the fact that the State proceeded upon a theory of acting in concert does not require the conclusion that defendants released Harris in a safe place simply because one of the other perpetrators arguably did so. To the contrary, the record, when viewed in the light most favorable to the State, contains substantial evidence that defendants did not undertake "conscious, willful action . . . to assure that [the] victim [wa]s released in a place of safety[,]" as required by N.C. Gen. Stat. § 14-39(b). *State v. Jerrett,* 309 N.C. 239, 262, 307 S.E.2d 339, 351 (1983). Smith, Thompson, and Tim all made statements threatening to kill Harris if they did not get what they wanted. Defendants again threatened to kill Harris just before leaving to pick up the money on the morning of 19 December 2005. In addition, while waiting for defendants to return with the money, Tim told Ingram: "we got to get rid of [Harris]." Ingram, on the other hand, testified that there had been no discussion about what to do with Harris and that he released Harris as a "spur-of-the-moment thing." The jury could reasonably conclude that the repeated threats to kill Harris prompted Ingram, acting alone, to take Harris and release him in the mall parking deck. Based on this evidence, the trial court did not err in denying defendants' motions to dismiss the first degree kidnapping charges.

II

**[2]** Defendants next argue that the trial court erred in its response to the jury's requests for clarification by re-instructing on first degree kidnapping, but not re-instructing on second degree kidnapping. We disagree.

Defendant Smith points to the trial court's instructions after the jury submitted the following note to the court:

The jury requests clarification of the following question: To what extent does an individual have to participate in a first-degree kidnapping to be considered a full participant? Please note the jury

is especially concerned about the section of law that Judge Allen read about this issue.

After returning the jury to the courtroom, the trial court responded: "I assume that you're asking about when I instructed you about acting in concert. Let me go over this again." Without objection from either defendant, the trial court proceeded to re-instruct the jury regarding the elements of both first degree kidnapping and acting in concert.

Defendant Thompson, however, points to the jury's request for clarification "regarding the interpretation of conspiracy. In particular, must a conspiracy have occurred prior to the commission of a felony kidnapping or can it occur once a kidnapping was under way?" The trial court then, without any objection by the parties, repeated its instructions on the charge of conspiracy to commit first degree kidnapping.

Defendants argue on appeal that the trial court should also have re-instructed the jury on second degree kidnapping. Defendants assert that the failure to do so (1) confused the jury as to whether second degree kidnapping was still a viable option as a verdict and (2) unduly emphasized first degree kidnapping over second degree kidnapping, thus tacitly expressing an opinion to the jury that first degree kidnapping was the proper offense for which defendants should be convicted.

After a court instructs the jury initially, it may provide additional instructions in order to respond to jury questions, to correct or clarify erroneous or ambiguous instructions, or to instruct the jury on an erroneously omitted issue. N.C. Gen. Stat. § 15A-1234(a)(1)-(4) (2007). "At any time the judge gives additional instructions, he *may* also give or repeat other instructions to avoid giving undue prominence to the additional instructions." N.C. Gen. Stat. § 15A-1234(b) (emphasis added). "The court is not required to repeat instructions which were previously given to the jury in the absence of some error in the charge but may do so in its discretion." *State v. Bartow*, 77 N.C. App. 103, 110, 334 S.E.2d 480, 484 (1985). The trial court's decision whether to repeat previously given instructions to the jury is reviewed for abuse of discretion. *State v. Prevette*, 317 N.C. 148, 164, 345 S.E.2d 159, 169 (1986).

Because neither defendant objected at trial, they are limited to arguing plain error on appeal. Our Supreme Court has held, however, that discretionary decisions by the trial court are not subject to

plain error review. *State v. Steen*, 352 N.C. 227, 256, 536 S.E.2d 1, 18 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997, 121 S. Ct. 1131 (2001). In any event, defendants have failed to demonstrate any abuse of discretion.

The defendant in *Prevette*, who was ultimately convicted of first degree murder, argued that the trial court had abused its discretion when, in response to the jury's request for clarification on malice, premeditation, and deliberation, the court only re-instructed the jury on first degree murder rather than on both first degree and second degree murder. 317 N.C. at 163, 345 S.E.2d at 168. In holding that the court's refusal to re-instruct the jury on second degree murder had not unduly emphasized first degree murder or misled the jury, the Court reasoned:

> In view of the jury's specific request for a clarification of ele-ments of first degree murder only, we hold that the trial court did not abuse its discretion in refusing to reinstruct on second degree murder pursuant to defendant's request. We believe it important to note that the trial court is in the best position to determine whether further additional instruction will aid or confuse the jury in its deliberations, or if further instruction will prevent or cause in itself an undue emphasis being placed on a particular portion of the court's instructions.

*Id.* at 164, 345 S.E.2d at 169.

Here, as in *Prevette*, the jury requested clarification on specific issues. First, they wanted to know: "To what extent does an individ-ual have to participate in a first-degree kidnapping to be considered a full participant?" The trial court's first re-instructions responded to this question regarding liability for first degree kidnapping. On the second occasion, the jury inquired about the conspiracy charge. The trial court re-instructed only on that charge—since the charge was conspiracy to commit first degree kidnapping, the court could rea-sonably conclude that an instruction on second degree kidnapping was unwarranted and potentially confusing. Under *Prevette*, there-fore, the trial court's decision not to re-instruct the jury on second degree kidnapping was not an abuse of discretion, especially in the absence of a request to do so by defendants.

III

**[3]** Defendants' final argument on appeal is that they are entitled to a new trial because the trial court coerced the jury into reaching a

verdict when it inquired into the jury's numerical split after only two and a half hours of deliberation. The court made the following pertinent statements:

> THE COURT: All right. The jury is still deliberating. They've deliberated now for about—close to three hours. I plan to bring them back in and, in my discretion, ask if there is a numerical split and instruct them on General Statute 15A-1235. I will give either side an opportunity to object. I think I have the authority to do that but I'll hear you.

The prosecutor objected, and Thompson's counsel was voicing his objection when the court interjected: "Well, I tell you, [Defense Counsel], if they come in here and say 6 to 6—I'm not going to sit down here all day. If they come in here and say 11 to 1 or 10 to 2 . . . ." At that point, the bailiff interrupted, indicating that the jury requested clarification on the law regarding conspiracy.

After calling the jury back into the courtroom but before re-instructing them on conspiracy, the court asked:

> I'm wondering if there is a numerical split, not guilty or not—or guilty or not guilty or not to any—any particular defendant, but is there a numerical split: 11 to 1? 10 to 2? 9 to 3? 8 to 4? 7 to 5? Or 6 to 6?
>
> Now, is there a numerical split?
>
> Just [say] yes or no.

When the foreperson responded that the jury was divided, the court then asked for the numerical split. The foreperson responded: "10 to 2." The court then gave the jury the instructions for a dead-locked jury, reciting almost verbatim the language of N.C. Gen. Stat. § 15A-1235(b)(1)-(4) (2007). Less than 30 minutes later, the jury came back with a unanimous verdict.

With respect to a trial court's inquiry into whether and to what extent a jury is split, "the totality of circumstances will be considered in determining whether the jury's verdict was coerced." *State v. Beaver*, 322 N.C. 462, 464, 368 S.E.2d 607, 608 (1988). "An inquiry as to a division, without asking which votes were for conviction or acquittal, is not inherently coercive." *Id.* "Some of the factors to be considered include whether the trial court conveyed the impression that it was irritated with the jury for not reaching a verdict, whether the trial court intimated that it would hold the jury until it reached a

verdict, and whether the trial court told the jury that a retrial would burden the court system." *State v. Nobles*, 350 N.C. 483, 510, 515 S.E.2d 885, 902 (1999).

Considering, in this case, the trial judge's inquiry into the jury's numerical split in light of all the circumstances, we cannot say that the jury's verdict was coerced. The trial judge did not ask which votes were for conviction or acquittal and did not say anything suggesting concern over the jury's failure to yet reach a verdict. Instead, the inquiry came only after the jury had asked for clarification on one of the issues, a natural break in the jury's deliberations, and the inquiry was expressed in language more typical of curiosity rather than irritation. *See State v. Streeter*, 191 N.C. App. 496, 504-05, 663 S.E.2d 879, 885 (2008) (holding that trial court's inquiry into numerical split two hours into deliberations was not abuse of discretion); *State v. Yarborough*, 64 N.C. App. 500, 503, 307 S.E.2d 794, 795-96 (1983) (holding that trial judge had not coerced jury's verdict by inquiring into their numerical split when "the trial judge made his inquiry as to the numerical split at a natural break in the jury's deliberations . . . and clearly stated that he did not want to know that so many jurors have voted in one fashion and so many in another" (internal quotation marks omitted)). Accordingly, we conclude that the judge's inquiry into the jury's division was not coercive.

**[4]** Defendants also argue that the judge coerced the verdict by instructing the jury—over both the prosecutor's and defendants' objections—according to N.C. Gen. Stat. § 15A-1235. N.C. Gen. Stat. § 15A-1235(c) provides:

> If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

Whether to give an instruction pursuant to N.C. Gen. Stat. § 15A-1235(c)—called an *Allen* instruction—lies within the discretion of the trial judge. *State v. Williams*, 315 N.C. 310, 326-27, 338 S.E.2d 75, 85 (1986). This Court has held that N.C. Gen. Stat. § 15A-1235(c) "does not require an affirmative indication from the jury that it is having difficulty reaching a verdict, nor does it require that the jury deliberate for a lengthy period of time before the trial court may give the *Allen* instruction." *State v. Boston*, 191 N.C. App.

637, 643, 663 S.E.2d 886, 891 (2008). "[I]n deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985).

In *Boston*, 191 N.C. App. at 644, 663 S.E.2d at 892, this Court held that the trial court did not err in giving the *Allen* instruction two hours after the jury had begun deliberating and two more times over a four-and-a-half-hour period, reasoning:

> In this case, the trial court never inquired as to whether the majority of the jury was in favor of guilt or innocence. In fact, the trial court specifically asked the jury foreman not to provide this information to the trial court. The record gives no indication that the trial court ever appeared frustrated with the jury or annoyed by the jury's failure to reach a verdict. Further, the trial court never threatened to hold the jury until it reached a verdict, and made no mention of the burden and expense of a retrial in the event the jury could not reach a verdict.

The Court also noted that "each of the trial court's inquiries and *Allen* charges either immediately preceded or followed a natural break in jury deliberations . . . [and] [t]he trial court never interrupted jury deliberations merely to inquire as to the jury's numerical division or to repeat the *Allen* charge." *Id. See also Streeter*, 191 N.C. App. at 504-05, 663 S.E.2d at 885 (holding that trial court did not abuse its discretion in giving *Allen* instruction after two hours of deliberation when record did "not show that the trial court attempted to coerce the jury into reaching a verdict").

Likewise, in this case, the trial judge—the same judge as in *Boston* and *Streeter*—did not ask whether the split was in favor of guilt or acquittal. The *Allen* instruction was given during a natural break in the proceedings: after the jury had asked for clarification of the conspiracy instruction. Defendants have pointed to nothing in the record—and we have found nothing—suggesting that the trial judge appeared frustrated or annoyed. In addition, the trial judge did not make any remarks beyond the instructions contained in the statute that might be viewed by a jury as coercive. While we recognize that the trial judge in this case appears to have a practice of giving an *Allen* instruction at an early stage in the deliberations, we can see no meaningful distinction between this case and *Boston* and *Streeter*

and, therefore, conclude that defendants have failed to demonstrate any abuse of discretion. *See also State v. Hunter*, 48 N.C. App. 689, 692-93, 269 S.E.2d 736, 739 (1980) (finding no abuse of discretion when, after one hour of deliberation, trial court inquired into numerical split of jury and instructed jury in accordance with N.C. Gen. Stat. § 15A-1235(c)).

No Error.

Judges McCULLOUGH and STEELMAN concur.